## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BOBBIE JAMES, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**GLOBAL TEL\*LINK CORPORATION, INMATE TELEPHONE SERVICE and DSI-ITI LLC,**<br><br>**Defendants.** | Civ. No. 13-4989 (WJM)<br><br><br>**OPINION** |

This matter comes before the Court on Defendants' motion to compel arbitration and stay this proceeding in the interim. The Plaintiffs bring this putative class action over fees charged by the Defendants for phone calls made by inmates from pay phones in New Jersey correctional institutions. The Court decides this motion without oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants' motion.

## I.    BACKGROUND

### A.    Factual Background

Global Tel\*Link Corporation, Inmate Telephone Service, and DSI-ITI LLC (collectively, "the Defendants" or "GTL") manage telecommunications services at state and local correctional facilities in New Jersey and other states. (Complaint ¶ 12, ECF No. 1.) The Defendants are all Delaware corporations, and Plaintiffs allege that they operate as a single economic unit. (*Id.* ¶¶ 14-16.) The State of New Jersey gave GTL the exclusive right to provide telecommunications services for inmates so that they may communicate with family, friends, and other approved persons outside the prisons. (*Id.*) GTL's service can be accessed by users telephonically through an interactive voice response ("IVR") system—using standardized scripts and prompts—or via GTL's website. (Declaration of John W. Baker ("Baker Dec'l") ¶ 2, ECF No. 95-2.) Through either of these methods, users can sign up for an account and deposit funds. (*Id.*)

Those who create an account through GTL's website are shown a copy of GTL's Terms of Use ("TOU") within their browser, and the user must click a button labeled "Accept" in order to complete the account creation process. (*Id.*) In contrast, users of the IVR system receive the following notice over the phone:

> Please note that your account, and any transactions you complete, with GTL, PCS, DSI-ITI, or VAC are governed by the terms of use and the privacy statement posted at www.offenderconnect.com. The terms of use and the privacy statement were most recently revised on July 3, 2013.

(*Id.*) GTL states that every user of the IVR service receives this notice before he or she can proceed to the remainder of the options. (Defendants' Brief in Support of Motion to Compel Arbitration ("Def. Brief") at 13.) However, unlike the website, users of the IVR system do not have to affirmatively register assent to the TOU. (*See* Baker Dec'l ¶ 2.)

The TOU contains an arbitration agreement and a corresponding class-action waiver. (*Id.* ¶ 4.) Users have thirty days in which to opt-out of both of these provisions. (Baker Dec'l, Ex. A ("TOU") § R(4), ECF No. 95-2.) The TOU also notes that use of the service (or clicking "Accept" when registering online) constitutes acceptance of the terms. (*Id.* §§ A-B.) Similar to the opt-out provisions, users have thirty-days in which to cancel their account if they do not agree to the TOU's terms. (*Id.*) Prior to July 2013, the TOU stated that GTL may amend the terms and that it would "post any material changes to [the TOU] on [its] Site with a notice advising of the changes." (Baker Dec'l, Ex. B § R, ECF No. 95-2.) Should a user not agree with the updated terms, they have fifteen days within which to cancel their account without being bound by the new TOU. (*Id.*) GTL alleges that a message was posted on its website's frontpage on or about July 2, 2013, informing users of the updated TOU. (Baker Dec'l ¶ 6.) The version of the TOU prior to July 2013 also stated that use of the service constituted acceptance of the terms. (Baker Dec'l, Ex. B § A.)

The plaintiffs in this action (Bobbie James, Crystal Gibson, Betty King, John Crow, and Barbara, Mark, and Milan Skladany, collectively, the "Plaintiffs") are inmates or friends or family of inmates, and used GTL's calling services in order to communicate with their loved ones. (Complaint ¶ 39.) GTL alleges that Crystal Gibson opened an account through GTL's website on July 29, 2014. (Baker Dec'l

¶ 8.) Prior to this, Gibson also opened an account through the IVR system on June 13, 2014, but closed it the same day. (*Id.*) However, Gibson states that she became a customer of GTL in approximately April 2011, but does not provide records for such an account. (Declaration of Crystal Gibson ¶ 2, ECF No. 99-4.) Bobbie James and Barbara and Milan Skladany opened accounts prior to July 2, 2013, but continued using their accounts after this date. (Baker Dec'l ¶ 9.) Betty King opened her first account on October 18, 2006, and closed it on July 9, 2013. She then opened a second account on November 15, 2014, through the IVR system. (*Id.* ¶ 10.) Lastly, GTL has not provided details for accounts opened by Dr. John Crow or Mark Skladany. Though Mr. Skladany's declaration does not state when he began using the service, the Complaint notes that Dr. Crow opened an account with GTL in April 2013. (Complaint ¶ 59.)

**B.   Procedural Background**

The Plaintiffs filed this putative class action in August 2013 alleging violations of the New Jersey Consumer Fraud Act ("NJCFA"), the Federal Communications Act ("FCA"), the Takings Clause of the Fifth Amendment, and various New Jersey public utilities statutes, as well as alleging unjust enrichment and seeking declaratory judgment. GTL moved to dismiss or stay this case, arguing that the Federal Communications Commission ("FCC") has primary jurisdiction. (Docket No. 20.) In an opinion dated September 8, 2014, the Court stayed this proceeding until either: (a) the FCC made a determination as to whether the challenged charges and practices violated the FCA, (b) the Plaintiffs voluntarily dismissed the FCA cause of action, (c) the Plaintiffs failed to file an administrative complaint with the FCC within 90 days from the filing of the D.C. Circuit's opinion, or (d) the parties made a showing of good cause to lift the stay. (Docket Nos. 35, 36.) Following the Court's opinion and order, Plaintiffs moved to withdraw the relevant counts from their complaint that had prompted this Court to stay the action. (Docket No. 38.) On November 26, 2014, GTL filed its answer and then filed an amended answer on March 9, 2015. (Docket Nos. 46, 67.) In the amended answer, GTL raised the possibility of arbitration, noting that some of the Plaintiffs (and the putative class members) may be subject to binding arbitration. (Defendants' Amended Answer at 16, ECF No. 67.) On May 6, 2015, GTL sought leave to file a motion to compel arbitration, which was granted on July 14, 2015. (Docket No. 75.) Subsequently, GTL filed the instant motion. In the interim, after GTL's first answer and prior to the filing of the instant motion, the parties engaged

in discovery pursuant to a scheduling order entered on February 17, 2015.  (Docket No. 61.)

## II.   LEGAL STANDARD

Federal law presumptively favors the enforcement of arbitration agreements. *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178 (3d Cir. 1999).  "The question of arbitrability—whether a[n] . . . agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  In considering the propriety of arbitration, a court must make "a two-step inquiry into (1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that agreement." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005).  "When determining both the existence and the scope of an arbitration agreement, there is a presumption in favor of arbitrability." *Id.*

The Third Circuit has held that when arbitrability is apparent on the face of the complaint (and/or documents relied upon in the complaint) a motion to compel arbitration should be analyzed under the Rule 12(b)(6) standard.  *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773–74 (3d Cir. 2013).  However, if either the complaint does not facially establish arbitrability or if the non-movant submits enough evidence to put the question of arbitrability in issue, then the motion to compel arbitration "should be judged under the Rule 56 standard."  *Id.* Under the summary judgment standard, the moving party must demonstrate that no genuine issue of material fact exists "concerning the formation of the [arbitration agreement]." *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980).  Moreover, the court must give the non-moving party the "benefit of all reasonable doubts and inferences." *Id.*

While the moving party has the burden of showing that the parties executed an agreement to arbitrate, *see Schwartz v. Comcast Corp.*, 256 F. App'x 515, 519 (3d Cir. 2007), if the moving party fulfills this showing, the agreement to arbitrate is found presumptively valid and enforceable, 9 U.S.C. § 2.  Then, it is the non-moving party that bears the burden of proving that the agreement is invalid.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221, 228-29 (3d Cir. 2012).

## III.   DISCUSSION

## A.     Agreement to Arbitrate

"Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect." *Par–Knit Mills*, 636 F.2d at 54.  Plaintiffs contest this fundamental requirement for the instant motion, arguing that they never assented to the arbitration agreement contained within GTL's TOU.

"To determine whether the parties have agreed to arbitrate, [courts] apply 'ordinary state-law principles that govern the formation of contracts.'"  *Century Indem. Co. v. Certain Underwriters at Lloyd's, London, subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646*, 584 F.3d 513, 524 (3d Cir. 2009).  The parties have not briefed the issue of choice-of-law.  A number of the Plaintiffs in this matter are New Jersey residents and, though the Defendants are incorporated in Delaware with principal places of business in Alabama, they provided their telecommunications services in the State of New Jersey.  (Complaint ¶¶ 6-17.)  In turn, the parties both cite to and apply New Jersey law in their papers.  Consequently, the Court concludes that New Jersey law applies to the issue of contract formation underlying the instant motion.

### i.     Motion to Strike

Before delving into the merits of GTL's motion, the Court first tackles the motion to strike raised by Plaintiffs in their opposition brief.  Plaintiffs ask this Court to strike legal conclusions made by John F. Baker in his declaration.  GTL, in turn, asks the Court to strike similar statements in the Plaintiffs' declarations.  The Court denies both motions to strike.  The Court will *sua sponte* disregard any legal arguments and conclusions in these declarations if and as necessary to its analysis.

Second, Plaintiffs argue that GTL's failure to produce the Post-2013 IVR script in a timely fashion necessitates that the Court exclude it pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure.  There are five factors to consider when determining whether to exclude evidence for non-disclosure:  "(1) the 'prejudice or surprise' of the party against whom the evidence is brought, (2) the ability of that party to cure the prejudice, (3) the extent to which including the evidence would disrupt the orderly and efficient trial of the case, (4) bad faith or willfulness in failing to comply with the court's order, and (5) the importance of the evidence."  *Warner Chilcott Labs. Ireland Ltd. v. Impax Labs., Inc.*, No. 8-CV-

6304, 2012 WL 161804, at *2 (D.N.J. Jan. 19, 2012) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977)). But, should the evidence be considered critical, its exclusion is deemed an extreme sanction, which should not be normally imposed "absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Pennypack*, 559 F.2d at 905.

As a preface, the Third Circuit has directed that cases should be "disposed of on merits whenever practicable." *Hill v. Williamsport Police Dep't.*, 69 F. App'x 49, 51 (3d Cir. 2003). There is certainly warrant to Plaintiffs' argument that GTL should have produced the entirety of the IVR script in its original motion. However, as to Plaintiffs' assertion that the script should have been produced before the motion, fact discovery was still open when the instant motion was filed, (*See* Docket No. 102), and the Plaintiffs have not cited to—nor has the Court been able to find—an instance where evidence was stricken prior to the closing of discovery. In addition, the script is critical evidence, as it is the basis on which the Court must decide whether GTL and its users agreed to arbitrate their disputes. *See infra* at 8. Excluding the scripts would, thus, hamper an orderly adjudication of GTL's motion by the Court. Lastly, while the record demonstrates that discovery between the parties has been contentious to some degree, the Court fails to find evidence that GTL acted with "bad faith or willfulness in failing to comply" with this Court's discovery orders. Therefore, the Court denies Plaintiffs' motion to strike the Post-2013 IVR scripts.

## ii. Accounts Created via the Phone

Because users of GTL's system can create and use their accounts by way of either the IVR service or the website, there are two distinct methods through which Plaintiffs could provide their assent to the arbitration clause within the TOU. The Court will, thus, tackle each medium separately in order to determine whether Plaintiffs made an "express, unequivocal agreement" to arbitrate their claims.

Plaintiffs James, King, and Barbara and Milan Skladany created their accounts through the IVR system.[1] As a threshold matter, the parties have not

---

[1] It appears that Gibson created a short-lived account through the IVR system. However, Plaintiffs have not made clear whether Gibson has any claims arising from this account. Should such claims exist, the reasoning here would apply equally to any obligation Gibson has to arbitrate such claims.

6

pointed to and the Court is unaware of any decisions that have addressed the issue of contract formation through an automated phone service—where users are notified of the existence of a service's terms and conditions over the phone and are, subsequently, bound by them.  In this case, GTL informed users—on every call— that the service they were providing was governed by a TOU and where users could obtain these terms—on its website.  (*See* Baker Dec'l ¶ 2.)  However, users were not required to engage in any affirmative conduct to demonstrate acceptance of the TOU.  Based on this, Plaintiffs argue that they cannot be ordered to arbitrate, as they did not have "full knowledge of [their] legal rights" and did not assent "to surrender those rights."  *Atalese v. U.S. Legal Servs. Grp., L.P.*, 219 N.J. 430, 442 (2014) *cert. denied*, 135 S. Ct. 2804 (2015).

As with any other contract, for an agreement to arbitrate to be "legally enforceable" the parties must (i) "agree on essential terms and [(ii)] manifest an intention to be bound by those terms," *i.e.* the contract must be the product of mutual assent and requires a "meeting of the minds."  *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992) (*cited with approval in Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 323 (3d Cir. 2006)); *see also Atalese*, 219 N.J. at 442.  Agreement is predicated on the parties being "fairly informed of the contract's terms before entering into the agreement."  *Hoffman v. Supplements Togo Mgmt., LLC*, 419 N.J. Super. 596, 606 (N.J. Super. Ct. App. Div. 2011) (*quoted with approval in Weisman v. New Jersey Dep't of Human Servs.*, 982 F. Supp. 2d 386, 394 (D.N.J. 2013) *aff'd* 593 F. App'x 147 (3d Cir. 2014)).  This is the "reasonable notice" standard and it "is a question of law for the court to determine."  *Caspi v. Microsoft Network, L.L.C.*, 323 N.J. Super. 118, 126 (N.J. Super. Ct. App. Div. 1999) (*quoted with approval in Liberty Syndicates at Lloyd's v. Walnut Advisory Corp.*, No. 09-CV-1343, 2011 WL 5825777, at *3 (D.N.J. Nov. 16, 2011)).  Consequently, the manifestation of assent requires an "unqualified acceptance" on the part of the offeree.  *Weichert*, 128 N.J. at 435.  Such "[a]cceptance can be express, creating an express contract, or implied by conduct, creating a contract implied-in-fact."  *Liberty Syndicates*, 2011 WL 5825777, at *3.

The Court finds that these prerequisites of contract formation are equally applicable to users of telecommunication services, such as the ones in the instant action.  *See, e.g., Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.")  With the proliferation of contracts over the Internet between companies and their end users,

New Jersey courts—state and federal—have applied these fundamental precepts to determine the enforceability of such contracts. *See, e.g., Liberty Syndicates*, 2011 WL 5825777, at *6; *Hoffman*, 419 N.J. Super. at 612; *Holdbrook Pediatric Dental, LLC v. Pro Computer Serv.*, LLC, No. 14-CV-6115, 2015 WL 4476017, at *7 (D.N.J. July 21, 2015). In particular, the Court finds similarity between the method of notice and assent employed by GTL in this case and those used in "browsewrap" agreements, where "by merely using the services of . . . the website [] the user is agreeing to and is bound by the site's terms of service." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012). In determining the validity of "browsewrap" agreements, courts look to whether users were provided with a "reasonably conspicuous notice of the existence of contract terms" and whether the user registered an "unambiguous manifestation of assent to these terms." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002); *see also Hoffman*, 419 N.J. Super. at 609 (noting that *Specht's* application of reasonable notice under California law was similar to New Jersey law). Accordingly, the Court will analyze whether "the specifics surrounding agreement revealed either that the user knew or should have known about the existence of the [terms of use] that contained the forum selection clause," *Liberty Syndicates*, 2011 WL 5825777, at *4, and whether Plaintiffs' use of the service is sufficient to manifest assent to the arbitration agreement within.

### a) Reasonable Notice of Terms

Plaintiffs were put on constructive notice as to the existence of the TOU and the fact that GTL's service was governed by the terms therein. Since neither party has put forth evidence that any of the Plaintiffs had actual knowledge of the agreement, the Court will instead determine "reasonable notice" based on whether a reasonably prudent user "would have known of the existence" of the arbitration agreement. *Specht*, 306 F.3d at 31. The IVR system provided an audio notice regarding the presence of terms of use at the outset—before customers could proceed to the remainder of the options—and users were informed how they could access the TOU, which was freely available on GTL's website. (*See* Baker Dec'l ¶ 2.) This prominent placement was sufficient to put users on inquiry notice as to the existence of the TOU. *See, e.g., Ticketmaster L.L.C. v. RMG Technologies, Inc.*, 507 F. Supp. 2d 1096, 1107 (C.D. Cal. 2007) (finding notice where the homepage displayed a warning regarding the presence of terms of use and the hyperlink to the terms were available on every page). *Cf. Specht*, 306 F.3d at 31 (finding reasonable notice lacking where the terms were placed on a "submerged

screen" and "did not carry an immediately visible notice of [their] existence"); *In re Zappos.com, Inc. Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064 (D.Nev. 2012) (finding lack of notice regarding the Terms and Conditions, which were buried in the middle to bottom of every page and amongst other links); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) *aff'd* 380 F. App'x 22 (2d Cir. 2010) (same). Moreover, the message was repeated each time a user called into the service. *See, e.g., Verio*, 356 F.3d at 401 (imputing knowledge of the terms of use based on the users' repeated use of the site and exposure to the accompanying notice); *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. C 04–04825, 2005 WL 766610, at *5 (N.D. Cal. Apr. 1, 2005) (finding reasonable notice where every page had a notice stating the existence of the "Terms of Use.") The medium employed by the parties to transact their business necessitates a consideration of what qualifies as reasonable and, as Plaintiffs acknowledge, it would be "virtually impossible for the terms and conditions including the arbitration clause to be available to a customer on the phone."[2] (Plaintiffs' Opposition to Motion to Compel Arbitration ("Pl. Opp.") at 12, ECF No. 99.) Thus, the Court finds that GTL's notice was sufficient to draw a reasonably prudent user's attention to the existence of the TOU and the arbitration clause within, presenting it in a conspicuous manner in light of the medium of communication used by GTL's service.

### b) Unqualified Assent

Moving to the second prerequisite—acceptance—the Court is faced with two separate issues: (i) whether New Jersey law allows for assent through use and (ii) whether the notice needed to inform users that they were providing acceptance in this fashion.[3] Under New Jersey law, "[s]ilence does not ordinarily manifest

---

[2] Similarly, Plaintiffs' assertion that the IVR notice should have informed users as to the presence of the arbitration clause within the TOU is unavailing. "Arbitration clauses are not singled out for more burdensome treatment than other waiver-of-rights clauses under [New Jersey] state law." *Atalese*, 219 N.J. at 444. Plaintiffs provide no reason why the arbitration provision should have been distinguished for inclusion on the IVR notice and to find that Plaintiffs "are not bound by [the arbitration] clause would be equivalent to holding that they were bound by no other clause either." *Caspi*, 323 N.J. Super. at 126.

[3] Plaintiffs argue that GTL should have required users to provide their assent through the IVR system—for example, by pressing a number on their keypad to register acceptance of the TOU. Plaintiffs' argument is unpersuasive. For one, New Jersey law does not require that assent be provided in this way. Second, any assent procured by asking users to agree to terms they have not had the opportunity to review would be plainly void.

assent, but the relationships between the parties or other circumstances may justify the offeror's expecting a reply and, therefore, assuming that silence indicates assent to the proposal." *Weichert*, 128 N.J. at 436-37 (1992) (citing *Johnson & Johnson v. Charmley Drug Co.*, 11 N.J. 526, 539 (1953)). Courts in New Jersey (both state and federal) have extended the principle of assent through silence to "use," finding assent where the offeree was given notice of terms and proceeded to use the services of the offeror. *See, e.g., Novack v. Cities Service Oil Co.*, 149 N.J. Super. 542, 548 (N.J. Super. Ct. Ch. Div. 1977) *aff'd sub nom. Novak v. Cities Serv. Oil Co.*, 159 N.J. Super. 400 (N.J. Super. Ct. App. Div. 1978) (finding that "acceptance or use of the card by the [cardholder] makes a contract between the parties according to" the terms of the cardholder agreement); *CACH of NJ, LLC v. Bode*, No. A-1137-13T3, 2014 WL 7192550, at *2 (N.J. Super. Ct. App. Div. Dec. 19, 2014) ("Use of a credit card creates a contract between the parties according to its terms"); *Ellin v. Credit One Bank*, No. 15-CV-2694, 2015 WL 7069660, at *3 (D.N.J. Nov. 13, 2015) (same).[4]

However, in order for silence or use to establish assent, the offeror must "give[] the offeree reason to understand that assent may be manifested" in such a way. *Restatement (Second) of Contracts* § 69 (1981). Surveying the landscape of "browsewrap" cases, the Ninth Circuit noted that "courts have been more amenable to enforcing browsewrap agreements" "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound" by the terms of use. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014); *see also Cairo*, 2005 WL 756610, at *2, *4–5 (enforcing forum selection clause in website's terms of use notice stated: "By continuing past this page and/or using this site, you agree to abide by the Terms of Use for this site, which prohibit commercial use of any information on this site.") Courts base enforceability on such a notice because "conduct of a party is not

---

[4] Plaintiffs contend that any assent obtained through use would be limited only to the offer's essential terms, which would not include an arbitration clause. *See Weichert*, 128 N.J. at 437. The Court does not find this argument compelling, as New Jersey courts have included and enforced mandatory arbitration provisions that are part of agreements procured in such a manner. *See, e.g., Ellin*, 2015 WL 7069660, at *3 (affirming validity of agreement that put plaintiff on notice regarding the agreement's arbitration clause and denoted acceptance by using the credit card's services); *MBNA Am. Bank, N.A. v. Bibb*, No. A-4087-07T2, 2009 WL 1750220, at *4 (N.J. Super. Ct. App. Div. June 23, 2009) (stating that defendant was required to arbitrate with the plaintiff bank since the credit card agreement specified that "when defendant 'use[]d [the] account, [she] agree[d] to' its terms.")

effective as a manifestation of his assent unless he . . . knows or has reason to know that the other party may infer from his conduct that he assents." *Restatement (Second) of Contracts* § 19 (1981). Since a contract is formed and a user is bound by the terms and conditions immediately upon using the service, such explicit notice at the outset forms the necessary predicate to establishing an "unambiguous manifestation of assent" to those terms.

Here, users were given notice that GTL's service was "governed by the terms of use." But, the IVR notification did not inform them that use of the service alone constituted an acceptance of these terms. (*See* Baker Dec'l ¶ 2.) "Unqualified acceptance" is incumbent on each party understanding at the moment of contract formation—from when they will be bound by the terms—the manner in which they are providing assent. Without being put on notice that their use would be interpreted as agreement, a reasonably prudent user of the IVR service had neither the knowledge nor intent necessary to provide "unqualified acceptance."[5] *See Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 WL 5568706, at *9 (N.D. Cal. Oct. 9, 2013) (stating that because only a link was provided to the terms of use there was no grounds to find that defendants were put on notice that mere use constituted assent); *Holdbrook*, 2015 WL 4476017, at *6 (finding no enforceable contract where "there [was] no statement that signing the agreement indicated acceptance of the "Terms and Conditions," nor [was] there an instruction to sign the contract only if [offeree] agreed to the additional terms.") Consequently, without an understanding that they were accepting to be bound by the TOU, which included an agreement to arbitrate, there was no "legally enforceable contract" created between GTL and the Plaintiffs.

---

[5] Though the first clause of the TOU informed users that their use of the service would constitute acceptance of the terms, such notification was in essence too late—occurring after GTL intended to bind its users to the agreement. *See Hines*, 668 F. Supp. 2d at 367. Similarly, unlike in *Verio*—where the Second Circuit found that repeatedly receiving a notice of terms after the defendant made its query (*i.e.* called into the service) was sufficient to ascribe notice, and thus ameliorating the *ex post facto* nature of the notice—the IVR notification's essential failure to inform callers that their assent would be garnered through use cannot be remedied by relying on the fact that users heard the notice on multiple occasions. *See Verio*, 356 F.3d at 401-02 (finding that defendant was bound by terms where notice informed accessors of the data that submission of their query constituted assent to the plaintiff's terms and that defendant repeatedly saw this message in its daily access of data).

### iii.  Assent to Updated Terms of Service

Since Plaintiffs who used GTL's IVR service did not manifest assent to the TOU, it is axiomatic that they did not agree to the clause allowing the company to modify the terms on a one-party basis and delineating the manner by which users would be notified of such amendments.  Thus, even though GTL alerted IVR users as to when the TOU was last updated, such notification—based on a non-enforceable contract and without telling users that use constituted assent to the amended terms—was insufficient to bind users to the arbitration clause contained within the modified TOU.  *Cf. Coiro v. Wachovia Bank, N.A.*, No. 11-CV-3587, 2012 WL 628514, at *3 (D.N.J. Feb. 27, 2012) (finding that plaintiff was bound by arbitration clause in modified agreement where the initial agreement stated that defendants could modify the terms of the agreement so long as plaintiff had thirty-day notice within which to close her account if she disagreed); *Mayer v. Verizon New Jersey, Inc.*, No. 13-CV-3980 (D.N.J. May 6, 2014), ECF No. 31 (finding acceptance of amendments through continued use of services).

### iv.  Accounts Opened Through the Internet

According to GTL's records, Gibson was the only plaintiff that created an account through its website.  (*See* Baker Dec'l ¶ 8.)  As part of this process, GTL asserts that, on a desktop computer, Gibson would have been presented with all of the terms of the TOU on the screen and she was required to click an "Accept" button in order to move forward in the account creation process.[6]  (*See id.* ¶ 2.) Gibson confirms this in her declaration, stating that she "check[ed] off the box for the terms of service" when she setup her account over the Internet.  (Gibson Dec'l ¶ 7.)  This form of electronic contract is referred to as a "clickwrap" agreement, where users are required to take affirmative action to manifest assent and are informed that such action will comprise their assent to the displayed terms.  *See Liberty Syndicates*, 2011 WL 5825777, at *4.  Numerous courts, including in this District, have enforced such agreements.  *See, e.g., Davis v. Dell, Inc.*, No. 07-CV-630, 2007 WL 4623030, *4-5 (D.N.J. Dec. 28, 2007) *aff'd*, No. 07-630 (RBK), 2008 WL 3843837 (D.N.J. Aug. 15, 2008); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007); *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 377–78 (S.D.N.Y. 2010).  Therefore, since Gibson was presented with all

---

[6] Since Gibson would have been presented with only this version of the site (and not the mobile version that went live in December 2014), the Court will restrict its analysis accordingly.

of the terms of the TOU—giving reasonable notice of the arbitration agreement—and because Gibson provided her assent to the TOU, she is required to arbitrate her claims against GTL, which fall under the broad scope of the arbitration clause. *See, e.g., Caspi*, 323 N.J. Super. at 122 (affirming lower court's decision to enforce arbitration clause where agreement "appear[d] on the computer screen in a scrollable window next to blocks providing the choices 'I Agree' and 'I Don't Agree'" and proceeding with registration required assent, which plaintiff provided.)

## B.    Duress

Because the Court has determined that Gibson assented to arbitrate her claims against the Defendants, the Court will now analyze whether such assent was garnered by GTL under duress and whether GTL waived its right to arbitrate the claims.[7]  Section 2 of the Federal Arbitration Act ("FAA") "permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.'"  *Concepcion*, 563 U.S. at 339.  These grounds include 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'"  *Id.*  "The FAA 'instructs courts to refer to principles of applicable state law' in order to determine the standards for such contract defenses."  *Trippe*, 401 F.3d at 532.

In its reply, GTL argues that because the arbitration clause contains a "delegation provision" any affirmative defense as to the invalidity of the arbitration clause must be referred to the arbitrator, basing the argument on the Supreme Court's holding in *Rent-A-Center, West, Inc. v. Jackson*.  561 U.S. 63, 130 S. Ct. 2772, 177 L. Ed. 2d 403 (2010).  However, the Third Circuit distinguished the Supreme Court's holding in *Rent-A-Center*, leaving it inapplicable to the instant action.  *Quillion*, 673 F.3d 221.

In *Rent-A-Center* the plaintiff, signed a contract to arbitrate disputes arising out of his employment, which contained within it an agreement to arbitrate arbitrability—a delegation clause similar to the one in the instant action.  *Id.* at 65.  As the Third Circuit opined, due to "the confusion caused by an agreement to

---

[7] Though the duress and waiver defenses are only applicable to Gibson (as described by the Court *supra*), since these defenses were raised by all of the Plaintiffs and Plaintiffs bring this suit on behalf of a putative class, the Court will continue referring to Plaintiffs collectively with respect to these defenses.

arbitrate nested within another agreement to arbitrate, the *Rent-A-Center* Court found it necessary to distinguish between the overall arbitration agreement [(the contract to arbitrate)], and the agreement to arbitrate arbitrability [(the delegation clause)]." *Quillion*, 673 F.3d at 229.  The Supreme Court's decision, thus, turned on the fact that "the plaintiff 'challenged only the validity of the contract as a whole' rather than the validity of the delegation clause," and under prior jurisprudence the question of arbitrability of the contract itself "must go to an arbitrator."  *Id.*

Here, Plaintiffs have taken care to raise their duress argument specifically towards the arbitration clause and not the TOU as a whole.  When "a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under" the FAA.  *Rent-A-Center*, 561 U.S. at 71.

Having determined that the duress argument is a threshold matter for the Court to resolve, the Court finds Plaintiffs' argument unpersuasive.  Under New Jersey law, the determination of duress is a two-part test: (1) a demonstration that the victim of the duress was subject to a wrongful or unlawful act or threat, and (2) that such act or threat must be one which deprives the victim of his unfettered will. *See Cont'l Bank of Pa. v. Barclay Riding Academy*, 93 N.J. 153, 176 (1983).  "The key factor in determining whether duress exists is 'the wrongfulness of the pressure exerted.'"  *Recchia v. Kellogg Co.*, 951 F. Supp. 2d 676, 683 (D.N.J. 2013).  However, the wrongful act must entail more than "merely taking advantage of another's financial difficulty."  *Cont'l Bank*, 93 N.J. at 177.  Instead, the party accused of coercion must have "contributed to or caused" the financial difficulty claimed.  *Id.* at 177.

The Court finds that Plaintiffs have failed to demonstrate the first prong of this test.  GTL's service was not the only method by which it was possible to contact inmates.  Putting aside in-person visits and mail, inmates could have communicated through collect calls or by the use of funds deposited in their commissary accounts, both of which would allow the inmate to call directly. Focusing on the arbitration clause, Plaintiffs were provided thirty days in which they could opt-out of both the arbitration and the class-action waiver provisions. Where parties have a choice, but fail to act upon it, it cannot be said that they were deprived of their "unfettered will."

**C.    Waiver**

14

Plaintiffs also argue that GTL's decision to wait two years before filing the instant motion amounts to a waiver of the right to arbitrate. The Third Circuit has held that if "a party has acted inconsistently with the right to arbitrate," a court may find that the party has waived its right to enforce an arbitration agreement. *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 208 (3d Cir. 2010) (internal quotation mark omitted). However, the Third Circuit has gone on to state that "[g]iven [the] strong preference to enforce private arbitration agreements, [courts] will not infer lightly that a party has waived its right to arbitrate" and waiver "will normally be found only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery." *Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 451 (3d Cir. 2011) (internal quotation mark omitted). A determination of waiver rests on a finding that the party seeking arbitration has, through their litigation conduct, subjected the non-moving party to sufficient prejudice by failing to promptly arbitrate the dispute.

In *Hoxworth v. Blinder, Robinson & Co.*, the Third Circuit set forth six "nonexclusive" factors that a court may use to guide its prejudice inquiry:

> (1) timeliness or lack thereof of the motion to arbitrate; (2) extent to which the party seeking arbitration has contested the merits of the opposing party's claims; (3) whether the party seeking arbitration informed its adversary of its intent to pursue arbitration prior to seeking to enjoin the court proceedings; (4) the extent to which a party seeking arbitration engaged in non-merits motion practice; (5) the party's acquiescence to the court's pretrial orders; and (6) the extent to which the parties have engaged in discovery.

980 F.2d 912, 926-27 (3d Cir. 1992). All these factors need not be present in order for a court to justify finding waiver, and the court's determination "must be based on the circumstances and context of the particular case." *Nino*, 609 F.3d at 208. After conducting a review of the *Hoxworth* factors, the Court finds that Plaintiffs have failed to demonstrate sufficient prejudice to deem GTL's right to arbitrate as waived.

### i.   Timeliness and Notice

Plaintiffs' contention is primarily grounded on the length of time between their initiation of this action and GTL seeking leave to file its motion to compel

arbitration—around two years.  While Plaintiffs cite to a number of Third Circuit decisions that have found waiver for substantially shorter delays, many of these hinged on the fact that the moving party "offered no explanation . . . for its delay." *See Gray Holdco*, 654 F.3d at 455; *Nino*, 609 F.3d at 210; *see also In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d 109, 118 (3d Cir. 2012); *JPMorgan Chase Bank, N.A. v. Republic Mortgage Ins. Co.*, No. 10-CV-6141, 2012 WL 6005384, at *4 (D.N.J. Nov. 30, 2012).  The Third Circuit has stated that "the length of the time between when a party initiates or first participates in litigation and when it seeks to enforce an arbitration clause is not dispositive in a waiver inquiry." *Gray Holdco*, 645 F.3d at 455.  Instead, the Third Circuit has asked courts to look to the party's "explanations for its delay." *Id.*  GTL offers a satisfactory explanation for waiting approximately two years before bringing the instant motion.  *See Thyssen, Inc. v. Calypso Shipping Corp.*, 310 F.3d 102 (2d Cir. 2002) (finding no waiver where defendant did not seek arbitration until more than eighteen months after suit was filed) *cited with approval in Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 598 (3d Cir. 2004).

The first thirteen months of this case were spent on GTL's motion regarding jurisdiction.  For nine of those months, the motion was under advisement with the Court, and the Court subsequently agreed with GTL and granted a stay.  In light of this, the Court does not feel it is appropriate to count these nine months against GTL.  Shortly after the case moved forward, as the Plaintiffs withdrew some of their claims in order to avoid the stay, GTL provided notice in an affirmative defense of its intent to seek arbitration—the third *Hoxworth* factor—and thereafter sought leave to file a motion to compel arbitration.  *See Nino*, 609 F.3d at 211 (noting that disclosure of intent to seek arbitration in an answer "is an important consideration . . . for the waiver analysis."); *Healthcare Servs. Grp., Inc. v. Fay*, No. 13-CV-66, 2015 WL 5996940, at *2 (E.D. Pa. Oct. 14, 2015) (finding no waiver where the motion to compel arbitration was not brought until two and a half years after the action was initiated).  *Cf. Gray Holdco*, 654 F.3d at 457 (finding prejudice where moving party notified non-movant of intent to arbitrate on the same day that it filed its demand for arbitration with the AAA).  While the two-year period would—in the abstract—likely demonstrate a waiver of the right to arbitrate, analyzing the unique procedural history in this action evidences that this time was not spent extending the litigation to prejudice the Plaintiffs.

16

### ii. Contestation of the Merits

The second, fourth, fifth, and sixth *Hoxworth* factors aim to highlight any prejudice suffered by the non-movant as a result of the movant's active engagement in litigation in lieu of seeking arbitration. The second *Hoxworth* factor looks to the "extent to which the party seeking arbitration has contested the merits of the opposing party's claims." 980 F.2d at 927. Though a motion to dismiss can address the merits of the underlying claims, the Court does not find that to be the case here, as GTL's motion was aimed at the threshold issue of jurisdiction. *Cf. Just B Method, LLC v. BSCPR, LP*, No. CIV.A. 14-1516, 2014 WL 5285634, at *10 (E.D. Pa. Oct. 14, 2014); *Republic Mortgage*, 2012 WL 6005384, at *4 (finding waiver after two motions to dismiss and a cross-motion for summary judgment); *Hoxworth*, 980 F.2d at 925-26 (finding waiver after motion to dismiss and opposition to class certification were filed). Additionally, "[t]he Third Circuit has found in the past that a single merits-based motion to dismiss did not waive a right to arbitration." *Serine v. Marshall, Dennehey, Warner, Coleman & Goggin*, No. 14-CV-4868, 2015 WL 4644129, at *3 (E.D. Pa. Aug. 5, 2015) *citing Wood v. Prudential Insurance Company of America*, 207 F.3d 674, 680 (3d Cir. 2000). Consequently, the Court does not find that this factor weighs in favor of waiver.

### iii. Non-Merits Motion Practice and Discovery

As to the fourth *Hoxworth* factor—engagement in "non-merits motion practice"—there has been little motion practice with regards to non-merits issues. 980 F.2d at 927. The parties have, however, engaged in a number of discovery-related disputes, which implicates the sixth *Hoxworth* factor—"the extent to which the parties have engaged in discovery." *Id.* In analyzing this factor, the Third Circuit has looked to not only the extent of discovery by the parties, but also whether the movant has engaged in discovery that would have been unavailable in an arbitration, thus prejudicing the non-movant. *Id.* at 926. Third Circuit opinions finding waiver have had significant discovery exchanges, including multiple depositions, interrogatories, documents requests and productions, as well as discovery-related motion practice. *See, e.g., Nino*, 609 F.3d at 213; *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 224 (3d Cir. 2007); *Hoxworth*, 980 F.2d at 925-26; *Gray Holdco*, 654 F.3d at 460.

Here, the discovery, while not *de minimus*, does not rise to a level sufficient to constitute prejudice to the Plaintiffs. For one, a number of the discovery

disputes seem to have been either (i) initiated by the Plaintiffs or (ii) took place after the instant motion was filed. *See Maxum Found., Inc. v. Salus Corp.*, 779 F.2d 974, 983 (4th Cir. 1985) (finding that defendant's participation in discovery and pretrial conferences after it had filed its motion to compel arbitration did not constitute waiver) *discussed with approval in Nino*, 609 F.3d at 212-13. Moreover, the discovery requested by GTL in this case—interrogatories and requests for production—seem to have been pertinent to the issue of arbitration. Lastly, there is no evidence that GTL engaged in any discovery that would not have been available in an arbitration. *See, e.g., Smith v. Lindemann*, No. 10-CV-3319, 2014 WL 835254, at *12 (D.N.J. Mar. 4, 2014); *NN&R, Inc. v. OneBeacon Ins. Grp.*, No. 03-CV-5011, 2006 WL 231596, at *5 (D.N.J. Jan. 30, 2006). *Cf. Smith v. IMG Worldwide, Inc.*, 360 F. Supp. 2d 681, 688 (E.D. Pa. 2005). Consequently, the fourth and sixth factors weigh against finding waiver.

### iv.  Acquiescence to Pre-Trial Orders

The last factor for the Court to consider is GTL's "acquiescence to the court's pretrial orders," the fifth *Hoxworth* factor. 980 F.2d at 927. GTL has participated without objection in a number of case management conferences, drafted and submitted a Joint Discovery Plan, negotiated a Discovery Confidentiality Order, and even negotiated and agreed to a revised scheduling order approximately a month before the instant motion was filed. *See Nino*, 609 F.3d at 213. Consequently, this is the sole factor that the Court finds weighs for waiver.

However, taken as a whole, the Court does not find that the fifth factor alone pushes the needle far enough to establish that GTL has waived its right to arbitrate. GTL puts forth plausible reasons for its delay in bringing the instant motion and, since the determination of the jurisdiction issue, GTL has acted in a manner consistent with the intent to arbitrate, including providing adequate notice and limiting motion practice and discovery. If "prejudice is the touchstone for determining whether the right to arbitrate has been waived by litigation conduct," *Ehleiter*, 482 F.3d at 222, the Court does not find that the Plaintiffs have been prejudiced to such an extent that a finding of waiver is appropriate here.

## D.  Stay as to the Remaining Plaintiffs

Lastly, the Court denies GTL's request to stay this proceeding in regards to Plaintiffs Mark Skladany and John F. Crow. Section 3 of the FAA states that if a

Court finds that a matter is "referable to arbitration," "on application of one of the parties [the Court must] stay the [] action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C.A. § 3.  However, the Third Circuit has stated that "Section 3 was not intended to mandate curtailment of the litigation rights of anyone who has not agreed to arbitrate any of the issues before the court." *Mendez v. Puerto Rican Int'l Cos.*, 553 F.3d 709, 712 (3d Cir. 2009).  As such, the determination of a stay as to parties who have not agreed to arbitrate is in the discretion of the court. *Id.*  GTL's stay argument centers on the fact that all of the other named Plaintiffs must arbitrate their claims.  GTL argues that staying the proceeding pending the outcome of those arbitrations will save judicial resources.  However, as discussed above, the Court finds that only Gibson is required to arbitrate her claims.  Since, GTL will be required to continue litigating against the majority of the Plaintiffs, GTL's economy and efficiency arguments are moot. *Cf. Villano v. TD Bank*, No. 11-CV-6714, 2012 WL 3776360, at *9 (D.N.J. Aug. 29, 2012) (granting stay where there was only one non-arbitrating party involved in the litigation).  Furthermore, the Court finds that a stay would only serve to materially prejudice the non-arbitrating Plaintiffs.  Accordingly, the Court will stay Gibson's claims pending completion of arbitration—as mandated by the FAA—but will decline to stay the claims of the remaining Plaintiffs, who are not bound by the arbitration agreement.

## IV.    CONCLUSION

For the above reasons, this Court **GRANTS** the Defendants' motion to compel arbitration and stay this proceeding as to Ms. Gibson, but **DENIES** the motion as to the remaining Plaintiffs.


_____
/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: February 11, 2016**

19