# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BOBBY JAMES, *et al.*, on behalf of themselves and all others similarly situated,,**<br><br>Plaintiffs,<br><br>v.<br><br>**GLOBAL TEL*LINK CORP., INMATE TELEPHONE SERVICE, and DSI-ITI LLC,**<br><br>Defendants. | Docket No.: 13-4989<br><br><br>OPINION |

**WILLIAM J. MARTINI, U.S.D.J.:**

Plaintiffs bring this action against Defendant Global Tel*Link and its subsidiaries (collectively, "GTL") in connection with GTL's provision of inmate calling services ("ICS") to State and county correctional facilities in New Jersey. Plaintiffs move pursuant to Federal Rule of Civil Procedure 23 to certify claims under (1) the New Jersey Consumer Fraud Act ("CFA") (Count One) and (2) the Takings Clause of the Fifth Amendment (Count Six). There was no oral argument. Fed. R. Civ. P. 78(b). For the following reasons, the Court **GRANTS** the Plaintiffs' motion for class certification of Counts One and Six.

## I. BACKGROUND

GTL provides ICS to all prisons and jails operated by the State of New Jersey and to each county facility except Passaic. These include 20 New Jersey Department of Corrections ("DOC") facilities and 21 county facilities.[1] *See* Taylor Decl. Supp. Class Cert. ("Taylor Decl."), Ex. E, Expert Report of Michael F. Finneran ("Finneran Report").

---

[1] Altogether, New Jersey facilities generate roughly five percent of GTL's revenue. *See* Finneran Report at 2.

1

In 2005, the DOC conducted a competitive procurement process to select an exclusive ICS provider to all state correctional facilities and most counties. The process began with a Request for Proposal ("RFP") detailing mandatory technical specifications tailored to the unique logistical and security requirements of ICS. The RFP sought the proposal "that best represents, in its opinion, the most advantageous solution for the State [based on] price and other factors." Van Nostrand Decl., Ex. 11. As is typical of procurement, the terms and conditions set forth in the RFP (or "the Solicitation") became the terms of the agreement, to be implemented according to the winning proposal. *See* N.J. Contract 61618 ("All terms and conditions as a part of Solicitation 32533 . . . and also including the bidder's proposal as accepted by the State are included herein . . ."); Taylor Decl., Ex. J, Expert Report of Melissa J. Copeland ("Copeland Report"). Accordingly, "RFP" and "contract" are used interchangeably unless stated otherwise.

AT&T won the bid in April 2005 and assigned the contract to GTL in June of 2005, though GTL did not assume operations until 2006.[2] Van Nostrand Decl., Ex. 11; Copeland Report, n. 1, 5. In addition to governing ICS for the DOC facilities, the RFP extended to thirteen county facilities. *See* RFP, Attachment 1.[3] Additional counties, including Essex and Bergen, procured services independently by issuing their own RFPs; these contracts resembled the main DOC contract in their use of large commissions, high calling rates, and other ancillary fees. *See infra*. The parties have stipulated to the rates and fees charged by GTL during the class period, which begins in 2006. *See* Taylor Dec., Ex. K.

### A. Site Commissions

One essential term of the DOC and county contracts was that GTL pay the government site commissions ("commissions"), defined by the RFP as "a straight percentage of all originating, billable revenue." Taylor Decl. Ex. J, Copeland Report at 5. Site commissions are calculated by multiplying minutes by calling rate, then multiplying that product by the commission percentage. They are not based at all on ancillary fees, such as account setup and deposit fees.

GTL's winning proposal offered the DOC (and participating counties) six billing options, each comprised of a commission rate and a calling rate. Higher commission rates were paired with higher calling rates. Ex 2, ¶ 25. Commissions ranged from 0% to 53%. The DOC selected a commission rate of 40% (later adjusted to 41%). Counties

---

[2] Several counties awarded contracts to DTS-ITI, which was purchased by GTL in 2010. Taylor Ex. G, Yow Dep. Tr. 221:6-222:2.

[3] The counties included Atlantic, Burlington, Camden, Cape May, Gloucester, Hudson, Hunterdon, Mercer, Monmouth, Morris, Ocean, Somerset, and Union. *See* RFP, Attachment 1. Of these thirteen counties, Hudson housed the most inmates at the time the RFP was issued (1833), and Burlington housed the fewest (42). *See id.* All other counties except for Passaic formed contracts with GTL (or one of its subsidiaries) independently.

participating in the DOC RFP overwhelmingly chose one of the two options with the highest commission and calling rate combinations. *See, e.g.*, Taylor Decl., Ex. K. In 2006, for instance, Camden and Somerset counties chose Option 2, with a 53% commission rate. *See, e.g.* Copeland Report at 6. GTL paid an average commission of 46% for all New Jersey contracts in 2009. *See* Rebuttal Report of Dr. Roy J. Epstein ("Epstein Rebuttal") ¶ 69.

Counties choosing to issue their own RFPs similarly emphasized generating revenue through site commissions. *See* Epstein Rebuttal ¶ 25. Atlantic County's 2007 RFP stated that it would reward the ICS contract to "the responsive and responsible bidder offering the Highest Commission Rate to the County," which could be not less than 50 percent. *Id.* at ¶ 27. In short, there is no disputing that commissions were an attractive revenue source for the State, counties, and GTL, and that commissions formed a central role in the procurement process. *See, e.g.*, Decision Memorandum, Essex County, Ex. H. Van Nostrand Decl. ("[T]his is a revenue generating arrangement."). Indeed, GTL's CFO, Stephen Yow, agreed that site commissions were probably the most important feature of ICS service agreements. Yow Dep. Tr. 42:4-5.

### B. Ancillary Fees

Not only did commissions lead to higher calling rates, they also incentivized GTL to impose higher ancillary fees to make up for revenue paid out in commissions. As Mr. Yow explained, "imposing deposit fees is a way to generate enough revenue from the facility to administer the commission they're expecting and also to cover all the other costs that we have to provide the service in that jail." Yow Dep. 170:16-20; *see, e.g.*. Epstein Rebuttal ("[D]eposit fee revenue can be used to recoup site commissions paid to facilities."). Most notably, GTL charged a 19% fee[4] each time a non-inmate set up or deposited funds into a GTL Advance Pay account.[5]

### C. Excessive Calling Rates and Ancillary Fees

Plaintiffs argue that ICS charges and fees were many times greater than the costs to GTL of providing ICS. For instance, "[d]uring the class period, GTL was charging as much as $1.00 per minute for calling time that it was paying as low as .018¢ per minute." Pls.' Br. Supp. Cert. at 1. Because the ICS contracts made GTL the exclusive provider, Plaintiffs—unlike normal telephone users—could not choose among different providers, and generally paid amounts far in excess of prevailing industry rates and fees. They argue that what emerged was a sanctioned, unregulated monopoly that generated substantial

---

[4] A minority (10-15 percent) of class members avoided this fee by using alternative payment methods, such as sending a check by mail, using Western Union, or (at certain facilities) paying on-site kiosks. Baker Dep. Tr. 37:8-38:11.

[5] An Advance Pay account is simply a prepaid account set up by a non-inmate (usually a family member) allowing the inmate to use funds to call a particular number or set of numbers.

revenue for the government and GTL by imposing excessive charges and fees on inmates and their loved ones. *See* M. Skladany Dep. Tr. 28:23-25 ("[P]eople were always . . . talking about the phone rates, how outrageous and, you know, felt like we were being extorted."). As the state legislature has found, "where a captive market exists for competitive telecommunications services, market conditions are not always able to protect the public interest." N.J.S.A. § 48:2-21.22. Many Plaintiffs likely chose to incur these charges out of sheer desperation for contact with their loved ones. *See, e.g.*, King Dep. Tr. 111:17-112:9.

Whether the charges and fees bore any relationship to the cost of providing ICS services is the subject of competing expert testimony. Mr. Finneran states that GTL charged between $0.05 and $0.89 per minute for calls that GTL itself was purchasing from carriers at a tiny fraction of those costs. Taylor Decl., Ex. F., Rebuttal Report by Michael Finneran, at 4-5. Michael Barth, Director of Network Planning & Contracts-Operations at GTL, testified that bulk rates could be purchased by GTL as low as $0.00018. Taylor Decl., Ex. I, Declaration of Michael Barth. Dr. Roy J. Epstein, hired to challenge Mr. Finneran's report, cautioned against viewing any one particular cost or fee in isolation. Epstein Dep. Tr. 79:11-25. Dr. Epstein also stated that providing ICS services requires specialized security and logistical costs, which are missing from Mr. Finneran's analysis.[6] Epstein Report ¶ 5. Not surprisingly, however, the largest "costs" Dr. Epstein identified were site commissions. *See id.* ¶¶ 9-10. Mr. Finneran's Rebuttal Report responds that "while the specialized call handling features . . . may have been expensive to develop 10 or 15 years ago, they are now available from cloud-based providers at far lower cost." Taylor Decl., Ex. F.

### D. Recent Decline in ICS Calling Rates and the Elimination of Site Commissions

Phone rates for New Jersey inmates have declined dramatically since the original GTL-DOC contract ended in 2010. That same year, the DOC eliminated commissions for State facilities, though county facilities participating under the DOC contract continued to collect commissions into 2014. *See* Epstein Report ¶ 25. From June 2010 to February 2014, GTL dropped rates for calls from State institutions to a flat rate of 33 cents per minute. As of July 30, 2015, after several additional reductions, the rate for all calls from State institutions was 4.384 cents per minute. Taylor Dec., Ex. K. Meanwhile, FCC regulations effective in February 2014 capped interstate call rates, causing GTL to drop the interstate call rate from county jails to 21 cents per minute for prepaid calls and 25 cents per minute for collect calls.[7] Intrastate calling rates from certain county facilities

---

[6] *See* Epstein Report ¶ 10. (explaining that ICS differs from normal services because it requires a system "to limit the number of calls placed by an inmate based on number of calls per day, number of calls per week, number of calls per month, cost of completed calls per day, cost of completed calls per week, cost of completed calls per month, or any combination thereof.").

[7] These FCC rate caps were ultimately struck down by *Global Tel*Link v. FCC*, 866 F.3d 397,

4

remained unchanged until their contracts expired at various points in mid-to-late 2016. GTL now charges roughly 5 cents per minute for all calls. Taylor Dec., Ex. K.

### E. Procedural History before this Court

Plaintiffs filed this action in August 2013 alleging violations of the New Jersey Consumer Fraud Act ("CFA"), the Federal Communications Act ("FCA"), the Takings Clause of the Fifth Amendment, the New Jersey Public Utilities statute, as well as alleging unjust enrichment, and seeking declaratory relief. ECF No. 1. On February 11, 2016, the Court granted Defendants' motion to compel arbitration for one Plaintiff, Crystal Gibson, but denied that motion with respect to the remaining Plaintiffs.[8] Plaintiffs expressed frustration with GTL's "pattern of promising to produce discovery and missing its own self-selected deadlines." *See* Letter of Lindsay Taylor, ECF No. 133. Nevertheless, Judge Falk's July 2017 scheduling order set a December 1, 2017 deadline for discovery, which included depositions of several expert witnesses. ECF No. 136. The parties met for a brief status conference before the Court on March 15, 2018. ECF No. 157.

On February 27, 2018, Plaintiffs moved to certify their class for the purposes of two claims: (a) GTL's alleged violation of the CFA, N.J.S.A. § 56:8-2, by charging unconscionable rates and fees, and (b) alleged violations of the Takings Clause of the Fifth Amendment. U.S. Const. amend. V. They propose the following class:

> All persons of the United States who, at any time since 2006 were incarcerated in a New Jersey prison or correctional institution who use or used the phone system provided by Defendants or, who established an advance pay account with Defendants in order to receive telephone calls from a person incarcerated in New Jersey, excluding Essex County prior to June 2010, or persons receiving calls from persons incarcerated in Essex County prior to June, 2011.[9]

On March 27, 2018, after opposing certification, Defendants moved for summary judgment on all counts. Plaintiffs filed an opposition and cross-motion for summary judgment on May 4, 2018. ECF No. 164. After several filing extensions at the request of Defense counsel, briefing on summary judgment concluded on June 8, 2018. The competing motions for summary judgment shall be addressed in a separate Opinion.

---

401 (D.C. Cir. 2017).

[8] That decision was affirmed by the Third Circuit on March 29, 2017. ECF No. 126.

[9] Claims relating to calls from Essex County before June 2010 are excluded because data is apparently unavailable. Since GTL's 2010 acquisition of DSI-ITI, "Essex County's calling records disappeared and Essex Count's copies of its commission statements were destroyed in Hurricane Sandy." Br. Supp. Cert. at n. 8, 7.

## II. DISCUSSION

"The trial court, well-positioned to decide which facts and legal arguments are most important to each Rule 23 requirement, possesses broad discretion to control proceedings and frame issues for consideration under Rule 23." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008), as amended (Jan. 16, 2009) (citations omitted). The Court finds that Plaintiffs have satisfied each requirement by a preponderance of the evidence. The following analysis begins with the four requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy), then proceeds to Rule 23(b)(3).

### A. Fed. R. Civ. P. 23(a)

#### 1. Numerosity

Numerosity is satisfied when joinder of all putative class members is impracticable. Fed. R. Civ. P. 23(a)(1). That is obviously true of this putative class, which includes many thousands of inmates and those who interacted with inmates by telephone over more than a decade.

#### 2. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality does not require perfect identity of questions of law or fact among all class members. Rather, even a single common question will do." *Reyes v. Netdeposit*, LLC, 802 F.3d 469, 486 (3d Cir. 2015) (citing *Wal–Mart Stores, Inc.,* 131 S.Ct. at 2556 (quotation marks and alterations omitted)); *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994) ("The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."). Here, Plaintiffs attempt to resolve a number legal and factual questions.

To find Defendants liable under the CFA, the Court must find that Defendants engaged in "unconscionable commercial practices" that caused Plaintiffs economic damages. Plaintiffs must prove that GTL charged end users (i.e. inmates and their friends and family) rates and fees "grossly excessive in relation to [GTL's] costs." *Kugler v. Romain*, 279 A2d 640, 530 (N.J. 1971). Although the facilities charged different rates and fees, Plaintiffs argue that even the least expensive pricing scheme imposed on the class was excessive in light of the costs to GTL of providing service. Pls.' Reply Br. at 3 ("All of the calling rates . . . ranging from between 40¢ per minute to over $1.00 per minute, were unconscionable, particularly since GTL was paying under 1 ¢ per minute."). The Court agrees; it is highly unlikely that some of GTL's pricing schemes were unconscionable under the CFA while others were not, since even the lower rates were many times greater than the alleged cost to GTL of providing services. *Id.* Differences in

rates and fees across facilities are more relevant to calculating individual relief during claims administration.

As for the Takings claim, whether GTL was a state actor under § 1983 is a question whose answer will likely be common to all class members. *See Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (citations omitted) (finding that a private company is a "state actor" when the "[s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity.") (citations omitted). Defendants argue that GTL's fees and rates differed across facilities because the facilities had separate contracts with GTL. More importantly, however, all GTL contracts were predicated on the same essential revenue-sharing arrangement, wherein "rate levels were directly tied to the amount of site commissions required." Defs.' Br. at 17. Whether these site commissions qualified as "significant encouragement" by the government sufficient to render GTL a state actor under § 1983 can be answered in common to all facilities. *Kach*, 589 F.3d at 648. In other words, GTL was a state actor with respect to all facilities or it was not a state actor at all. *See Wal-Mart*, 564 U.S. at 350-51.

### 3. Typicality

Certification requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994) (citations omitted). "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Id.* at 58. "Indeed, even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Id.*

The Court finds that the named representatives assert claims that are typical of the class as a whole. Plaintiff Mark Skladany was incarcerated and used ICS at various state and county facilities in New Jersey during the class period. M. Skladany Dep. Tr. 31:11-14, 51:15-16. He sometimes deposited money into his GTL account using his inmate commissary account. *Id.* at 44:23. Other times he relied on his family members to deposit funds into an Advance Pay account. *Id.* at 42:8-12. The other three representatives are non-inmates who opened GTL Advance Pay accounts in order to communicate with their incarcerated loved ones. They incurred the same 19% deposit fee as did other non-inmate class members. *See, e.g.*, King Dep. 102:1-9. Most importantly, the representative Plaintiffs exhibit a "strong similarity of legal theories," applicable to the entire class. *See*

*Baby Neal for & by Kanter*, 43 F.3d at 57. Accordingly, Plaintiffs have demonstrated typicality beyond a preponderance of the evidence.

4. Adequacy

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Fed R. Civ. P. 23(a)(4). Courts must examine both the qualifications of class counsel and the class representatives. *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016). In this case, counsel is sufficiently experienced and competent to prosecute the matter on a classwide scale. GTL, however, challenges the adequacy of the class representatives. It argues that the "named Plaintiffs had difficulty describing the nature of the claims being asserted, have rarely communicated with counsel and have done very little to monitor the case." Defs.' Opp'n Br. at 30. This argument deserves little. The Court has thoroughly reviewed the Plaintiffs' deposition transcripts. At times, each struggled in an unfamiliar and relatively high-pressure environment to articulate details about a complex litigation. Nevertheless, the transcripts show that each understands the classwide allegations and that each understands they represent not just themselves but the entire class. *See, e.g.*, King Dep. Tr. 120:8-13, 121:6-13; James Dep. Tr. 19:22-20:2; M. Skladany Dep. Tr. 94:6-13; S. Skladany Tr. 9:12-20.

**B. Rule 23(b)(3): Predominance and Superiority**

1. Do Common Issues Predominate?

To certify this class under Rule 23(b)(3), the Court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This analysis tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Courts must examine elements of the underlying claim to determine whether common questions of law and fact predominate, albeit without ruling on the merits. *See Wal-Mart Stores*, 564 U.S. at n. 6, 251 ("In this case, proof of commonality necessarily overlaps with respondents' merits contention that Wal–Mart engages in a pattern or practice of discrimination."); *see Neale v. Volvo Cars of N. Am. , LLC*, 794 F.3d 353, 370 (3d Cir. 2015).

*i.     Variations in State Law (Choice of Law)*

A federal court sitting in diversity applies the choice-of-law rules of the forum state to determine the controlling law. *Maniscalco v. Brother Intern. (USA) Corp*, 709 F.3d 202, 206 (3d Cir. 2013). GTL believes that choice-of-law issues undermine

predominance in this matter. "To the extent out-of-state customers wish to assert a consumer fraud claim for allegedly unconscionable rates and fees," GTL argues, "they would have to do so under their home state law." Defs. Br. Opp'n Cert. at 21. The Court disagrees with GTL's uncited, categorical assertion that the CFA "does not apply to out-of-state customers." *Id.*

Adhering to the Restatement (Second) of Conflict of Laws, New Jersey courts ask which jurisdiction has the "most significant relationship" to the claim or claims. *Id.* at 207. Regardless of whether the Court applies § 145 (The General Principle) or § 148 (Fraud and Misrepresentation), New Jersey clearly "has the most significant relationship to the occurrence and the parties."[10] Although the location of harm often dictates the choice of law in tort and consumer fraud cases, *see Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 461 (D.N.J. 2009), every class member is undeniably tied to New Jersey in a crucial way: each ICS phone call either originated or terminated in a New Jersey correctional facility. Further, regulating correctional facilities is an essential state function that overwhelmingly implicates state and local interests rather than the competing interests of other states. Even the least proximate class members—say, those who never stepped foot in New Jersey but accepted calls from family or friends incarcerated there—directly implicate New Jersey's interest in regulating its prisons.

### ii. *CFA § 56:8-2 – Unconscionability (Count One)*

Federal courts sitting in diversity apply substantive state law, as interpreted by the state's highest court. The relevant CFA provision states as follows:

> The act, use or employment by any person of *any unconscionable commercial practice*, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J.S.A. § 56:8-2 (emphasis added).

---

[10] The Court reaches this conclusion while considering: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6 (1971).

Plaintiffs allege that GTL engaged in unconscionable business practices by setting grossly excessive rates and fees. Although pricing differed somewhat across facilities, Plaintiffs argue that even the lowest rates and fees were unconscionably high in relation to the actual cost of providing ICS.

GTL argues that "an unlawful practice" necessarily involves deceptive conduct, which turns on each plaintiff's individual circumstances. The Court agrees that if the CFA requires deception, then individual questions of fact likely predominate. On the other hand, if conduct can be "unconscionable" without deception, and if unconscionability pertains to a single pattern or practice undertaken by GTL, then "questions of law or fact common to class members" likely predominate over questions affecting individual class members. For reasons set forth in today's summary judgment Opinion, the Court finds that a defendant's business practice does *not* need to be deceptive in order to be "unconscionable" under the CFA. Further, Plaintiffs allege that even the lowest pricing schemes were unconscionably expensive. Plaintiffs therefore satisfy the commonality requirement with respect to Count One.

### iii. Section § 1983 - Takings Claim (Count Six)

Liability under § 1983 extends only to "persons" acting "under color of state law." A non-government entity may be a "state actor" under § 1983 under certain circumstances, as when a private actor and the government work or operate together to achieve common interests. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982). Plaintiffs allege that GTL acted as a state actor throughout the class period. Defendants argue that individual issues predominate as to whether GTL was a "state actor," since the DOC and the county facilities formed separate agreements with GTL, each with different rates, fees and commissions. The Court, however, finds that these differences were incidental to the core revenue-sharing arrangement that was common to each of the contracts.

The relevant inquiry is whether GTL was a "willful participant in a joint activity with the State or its agents," *id.* at 941, and whether the State provided "significant encouragement, either overt or covert," for the activity." *Blum v. Yaretsky*, 457 U.S. 991 (1982). Although the counties may have selected different "options" from GTL's RFP, the essential business practice—and its causal relationship to the alleged harm sustained by Plaintiffs—is common to all class members. Specifically, the government and GTL formed exclusive contracts under which GTL allegedly shifted the costs of higher site commissions to end users in the form of higher calling rates and ancillary fees. Stephen Yow, GTL's chief financial officer, testified that regardless of the particular contract, "the correctional institution would determine" whether to impose a setup fee for an Advance Pay account. Yow Dep. Tr. 63:17. GTL employee John Baker testified that the process for setting up an account over the phone did not vary substantially based on the facility or location of the customer. *See* Baker Dep. Tr. 21:10, 25:20. Defense Expert Dr.

Epstein opined that costs of implementing GTL's services vary considerably across facilities, a claim recapitulated in GTL's brief. Defs.' Opp'n Cert. at 18. But there is no concrete evidence that such costs varied so substantially as to make some fees unconscionable and others not.[11]

Defendants further argue that the claims are not ripe because Plaintiffs have not exhausted all administrative remedies. Yet there does not appear to be any state administrative remedy available. *See Knick v. Twp. of Scott*, 862 F.3d 310, 323 (3d Cir. 2017), *cert. granted in part sub nom. Knick v. Twp. of Scott, Pa.*, 138 S. Ct. 1262, 200 L. Ed. 2d 416 (2018). Plaintiff Mark Skladany attempted unsuccessfully to file written grievances at multiple facilities regarding what he perceived to be excessive phone rates. M. Skladany Dep. Tr. 30:19-33:6. And although the BPU has authority to fix rates, it does not appear authorized to provide the sort of compensatory relief sought by Plaintiffs. *See* N.J.S.A. 48:2. To the extent a petition for a rulemaking qualifies as administrative relief, the BPU already rejected a Petition that closely tracked the claims in this case. Van Nostrand Decl., Exs. 2, 3. Without an administrative process by which putative class members may apply for "just compensation," requiring Plaintiffs to exhaust administrative remedies would be futile.

### iv. Calculating Damages on a Classwide Basis

Certification under Rule 23 requires that Plaintiffs "establish that damages are susceptible of measurement across the entire class." *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). The question is not whether Plaintiffs have engaged in a complete or accurate calculation, but whether damages are "*capable* of measurement on a classwide basis," *Comcast*, 569 U.S. at 34, and whether a common methodology can be used to calculate individual damages. *See* Newburg on Class Actions, § 12.4. In this case, the theory underlying both claims is that GTL imposed excessive fees and rates in light of the costs of providing ICS and in comparison to prevailing market rates.

The Court finds that Plaintiffs' expert, Michael Finneran, has demonstrated that he can calculate the total amount of damages owed to the class, even if he has not yet perfected that calculation. Although Mr. Finneran admits that his initial analysis contained certain miscalculations and inaccuracies, his basic methodology adequately reflects Plaintiffs' theory of liability. Mr. Finneran's report assumes a reasonable calling rate of 5-cents-per-minute, based on his extensive experience in the telecommunications industry and the fact that GTL currently charges roughly 5 cents per-minute for all calls. Meanwhile, Defendants allegedly charged between 40 cents and $1.00 per minute during the class period. Mr. Finneran further assumed that a reasonable deposit fee would be 3%, in line with standard credit-card processing fees. By comparison, GTL imposed a

---

[11] Defendants cite a study by the National Sheriff's Association ("NSA") finding that costs vary significantly across facilities. Defs.' Br. at 18. As Plaintiffs observe, however, the study was not specific to New Jersey facilities.

19% fee to set up a prepaid account and a 19% fee each time a deposit was made. Using GTL's monthly commission statements, Mr. Finneran calculated what GTL's revenue would have been between 2007 and 2017 had reasonable rates and fees been imposed, then subtracted that amount from the actual revenue GTL produced. The difference (roughly $150 million) between these two figures represents the total amount of excessive charges and fees during the time period.[12] *See* Finneran Extended Rebuttal, at 2. Relief to each class member—overseen by a claims administrator—would equal the difference between what the individual should have been charged (had GTL applied reasonable rates and fees), and what the individual was in fact charged. The fact that Mr. Finneran's calculation may require additional revisions is immaterial, and Defendants make too much of the fact that 100-percent accuracy may be implausible; "courts have consistently held that such estimative techniques need not be exact at the class certification stage," so long as the method for calculating damages matches the theories of liability. 4 Newberg on Class Actions § 12:4 (5th ed.) (citing *Comcast v. Behrend*, 569 U.S. 27, 35 (2013)).

2. Ascertainability

To satisfy the "ascertainability" standard, Plaintiffs must show that (1) the class is defined by reference to objective criteria; and (2) there is a "reliable and administratively feasible mechanism" to identify class members. *See Byrd v. Aaron's, Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) *as amended* (Apr. 28, 2015). Plaintiffs have satisfied both criteria by a preponderance of the evidence.

*i. Class Definition*

The class is properly defined according to objective criteria, with one caveat. The class is overinclusive in that it runs through to the present, even as the Complaint (and Plaintiffs' expert) presupposes that current rates and fees are reasonable. *See In re GMC Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 793 n. 14 (3d Cir.1995). Specifically, on July 30, 2015, GTL reduced the flat rate for all calls from DOC facilities to $.04384 per minute. Similarly, GTL dropped rates in county facilities to roughly $0.05 per minute when their respective contracts expired in the summer of 2016. An individual who only used GTL's services after this time presumably did not suffer damages according to Plaintiffs' theory. The Court will amend the class period to end in 2016 rather than run through the present. Of course, some degree overinclusiveness will remain, but assiduous claims administration, not denial of certification, is the appropriate course under Rule 23.[13]

---

[12] Obviously, this is a simplified description. The actual calculations must account for additional variables and changes in rates during the class period. *See* Finneran Extended Rebuttal, at 3. Further, the calculations should track the actual class period, which was 2006 to 2016.

[13] The Court may again amend the class or create subclasses if appropriate. *See, e.g.*, *Clarke v. Lane*, 267 F.R.D. 180, 194 (E.D. Pa. 2010). ("All class certification orders are conditional and 'the court retains the authority to re-define or decertify the class until the entry of final judgment

### ii. Administrative feasibility

GTL argues that there is no administratively feasible mechanism to identify class members because GTL did not always collect personal identifying information from inmates and other end-users. Defs.' Br. Opp. at 28. The Court disagrees. Rule 23 does not require that plaintiffs identify all class members at class certification—instead, a plaintiff need only show that "class members *can* be identified." *Id.* (citing *Carrera*, 727 F.3d at 308 n. 2) (emphasis added). Moreover, the Third Circuit recently determined that "[a]ffidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard." *City Select Auto Sales Inc. v. BMW Bank of N. Am.*, 867 F.3d 434, 441 (3d Cir. 2017) (hereinafter "*City Select*").

GTL retains data regarding every transaction and all calls into and out of state and county correctional facilities. Baker Dep. Tr. 84; Phillips Dep. Tr. 51:10. Margaret Phillips, Executive Director of Billing Services for GTL, provided insight into the company's data retention procedures, which are generally dictated by GTL's contract with the facility.[14] *See* Phillips Dep. Tr. 14-15. As for GTL's retrieval capabilities, detailed call records "are kept pretty much indefinitely," *Id.* at 16:15, and are "archived off to some sort of backup media and then stored." *Id.* at 17:7-8. The process of identifying class members may differ slightly depending on which of the four GTL payment methods are used to fund a particular call. These include (a) Advance Pay; (b) inmate debit accounts (c) calling cards; and (d) collect calls. *Id.* at 45:3-9. The Court reviews each of these methods and concludes that none poses a significant threat to administrative feasibility.

The most common payment method is GTL's Advance Pay system, which allows non-inmates to set up prepaid accounts that can be used to dial a specific number (i.e. the friend or family member who establishes the Advance Pay account). At the very least, these class members can be identified by the telephone number associated with each account, which doubles as the account number internally in GTL's databases. Phillips Tr. 85. In many cases, setting up an Advance Pay account also involves providing GTL with the account holder's name, address, and other personal identifying information. *See id.* at 73:5-6; Taylor Decl., Ex. L (Account Summary of Bobby James). Information regarding all payments, fees and transactions associated with an Advance Pay account can be easily retrieved using the telephone number associated with the account. *See, e.g.*, *id.*. Indeed,

---

on the merits.'").

[14] Defendants proceeded to the summary judgment stage while this motion as pending. The 2015 deposition of Margaret Phillips is Exhibit R of the Plaintiffs' Opposition to Summary Judgment and Cross-Motion for Partial Summary Judgment, filed May 4, 2018, ECF No. 165. Although it was not attached to this certification motion, filed February 27, 2018, the deposition now belongs to the record, and there is no reason to ignore reliable evidence that is relevant to deciding this motion.

GTL must possess this information in order to respond to routine inquiries about "account balances and other account services." Phillips Dep. Tr. 73:16-21. Class members need only provide an affidavit with proof that the particular phone number associated with the account belonged to that class member during the relevant time period. *See id.* at Tr. 137:6-9.

Next, DOC inmates may deposit funds from their debit (or commissary) accounts into a GTL account to pay for outgoing calls. At the 20 DOC facilities, each inmate is assigned an IPIN (Individual Identification Number). *See* ECF No. 158-5 (Excerpt from Inmate Handbook) (expressly identifying GTL as "the providers of the IPIN system."). The IPIN system allows GTL to limit outgoing calls by a particular inmate to a list of ten numbers requested by the inmate through a DOC Inmate IPIN Assignment Form. The RFP further requires that GTL provide the DOC with means for inquiring and monitoring inmate telephone activity. *See* Van Nostrand Mar. 27, 2018 Decl., Ex. 11. The same requirements extended to those counties which chose to purchase off of the DOC RFP. *See, e.g.*, Copeland Report at 6. Counties contracting independently with GTL seem to have made similar demands. To the extent GTL struggles to assemble debit call records internally, they may be aided by the facilities themselves.

Third, inmates at many facilities can purchase a prepaid calling card from a third-party commissary (or vendor). A specific PIN number is assigned to each card. To dial out from a facility, an inmate simply enters the PIN number, and applicable fees and charges are deducted from the card. Although in this scenario an inmate does not set up a GTL account, GTL nevertheless keeps records of all outgoing calls made using each PIN. The company's Executive Director of Billing testified that GTL maintains records matching pin card numbers to personal identifying information as well as transaction information. Phillips Dep. Tr. 155-157. On the other hand, Defendants' opposition brief refers to the testimony of GTL employee John Baker, who claimed (mistakenly, perhaps) that GTL cannot track PINs associated with call records to individual inmates. Baker Dep. Tr. 116:20-22. Ms. Phillips' testimony carries more weight in this context. Whereas Mr. Baker is "responsible for the customer experience, as it relates to using the channels that are available to make a payment," *id.* at Tr. 14:9-11, the testimony of Ms. Phillips (as Executive Director of Billing) reflects more intimate knowledge of GTL's data management capabilities.

Fourth, inmates may place collect calls[15] to friends and family, who may choose to accept or deny the call. In this context, the class member is the person who accepts the

---

[15] Calling collect is referred to in the familiar sense: "a calling arrangement whereby the called party agrees to pay for charges associated with an inmate calling services call originating from an inmate telephone." Yow Dep. Tr. 146: 22-25. Because of "bad debt" associated with collect calls, such calls have become an increasingly small percentage of the total calls made by inmates in GTL-serviced facilities. Yow Dep. Tr. 149:1-6.

14

call (and incurs the charge), not the inmate. It appears that, as is the case with outgoing debit calls, DOC inmates (and presumably inmates in county facilities) must enter a unique IPIN prior to making a collect call. Collect call recipients can establish class membership in several ways. First, the recipient could simply provide call records from his or her own carrier, which would reflect any charges from GTL. *See* Yow Dep. Tr. 157:22-158:2. Second, the claimant could provide an affidavit attesting to his or her phone number and identifying by name the inmate who made the call. From that point, GTL should be able to match the inmate's name to his or her IPIN in order to pull transaction records and verify which calls took place.

GTL contends that it lacks pre-2010 data from several facilities previously served by ITI, which GTL acquired that year. *See* Baker Dep. Tr. 77:2-3. The bare assertion that "GTL does not have records for accounts opened with [DSI-ITI]," Baker Dep. 73:22-74:8, 76:21-77:3, is no basis for denying certification. GTL is a large, sophisticated corporation of the sort unlikely to make major acquisitions without integrating its information management systems. The Court will not deny certification simply because Defendants have not yet produced a subset of data useful for identifying certain class members.

Notwithstanding GTL's protestations, this case is a far cry from *Tropicana*, in which the Court denied certification based on the plaintiffs' failure to satisfy the Third Circuit's ascertainability requirement. 2018 WL 497071, at *9. In *Tropicana*, the plaintiffs presumed the existence of large quantities of data that was distributed across thousands of third-party retailers, with no common database. Here, there is concrete evidence that most, if not all, class members can be identified with information that is accessible to GTL, and there are relatively straightforward (albeit potentially arduous) mechanisms for cross-checking records.

### C. *In Re Global Tel*Link Corporation ICS Litigation*

Lastly, the Court addresses GTL's contention that recent developments in other litigation involving GTL weigh strongly in favor of denying certification in the instant action. In a separate case filed in 2013 in the Western District of Arkansas, GTL faces allegations that its interstate rates and fees are "unreasonable" in violation of the Federal Communications Act and amount to common law unjust enrichment. *In re Global Tel*Link ICS Litig.*, No. 5:14-cv-5275-TLB (W.D. Ark.) ("*In re GTL*"). The Arkansas court granted certification on February 3, 2017, but then decertified the class and granted summary judgment in the defendants' favor on June 29, 2018. *Mojica v. Securus Tech., Inc.*, 2018 WL 3212037 (W.D. Ark. June 29, 2018). In a letter addressed to this Court on July 10, 2018, GTL argued that the Arkansas decision weighs heavily in favor of denying Plaintiffs' instant motion for certification. ECF No. 175. The Court sees a red herring.

As Plaintiffs responded in a letter filed July 12, 2018, ECF No. 178, the Arkansas claims differ in crucial ways from those asserted here. First, common law unjust enrichment, unlike the CFA unconscionability theory proposed here, depends heavily on the "individual circumstances" of each plaintiff to establish liability. More specifically, plaintiffs would be eligible for an exception to the voluntary payment doctrine if they could show "duress, fraud, mistake or failure of consideration." *Mojica*, 2018 WL 3212037, at *7 ("For any given phone call, it is impossible to know whether a class member's use of ICS on that occasion was voluntary or the product of, e.g., duress, without examining the particular circumstances surrounding that call, including the contents of the call itself."). In other words, the unjust enrichment theory would require an "inherently individualized inquiry." *Id.* That is not true of the CFA claims here.

Second, the Arkansas plaintiffs asserted that site commissions were "*per se* unreasonable" under the Federal Communications Act. The district court observed that this position contradicted a recent holding by the Court of Appeals for District of Columbia, which struck down the FCC's categorical prohibition of site commissions as arbitrary and capricious. *See Global Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) ("*FCC*"). Here, Plaintiffs claim that the specific commissions, together with specific ancillary fees, violated a state statute and the Takings Clause of the Fifth Amendment. They do not argue that site commissions are *per se* unlawful. Nor have they challenged the rulemaking of a federal agency. Neither the decertification of the class in Arkansas nor the Court of Appeals' decision in *FCC* undermines the Court's conclusion here, which is that Plaintiffs have met the requirements of Rule 23 by a preponderance of the evidence.

### III. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion for class certification is **GRANTED** as to Counts One and Six.

          /s/ William J. Martini
      **WILLIAM J. MARTINI, U.S.D.J.**

**August 6, 2018**