UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOBBY JAMES, *et al.*, on behalf of themselves and all others similarly situated, ,<br><br>    Plaintiffs,<br><br>    v.<br><br>GLOBAL TEL*LINK CORP., INMATE TELEPHONE SERVICE, and DSI-ITI LLC,<br><br>    Defendants. | Docket No.: 13-4989<br><br>**OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

Plaintiffs bring this class action against Defendant Global Tel*Link and its subsidiaries (collectively, "GTL") in connection with the company's provision of inmate calling services ("ICS") to state and county correctional facilities in New Jersey. GTL moves for summary judgment of all four remaining claims pursuant to Federal Rule of Civil Procedure 56. Plaintiffs have cross-moved for partial summary judgment as to whether GTL violated the Takings Clause of the Fifth Amendment. U.S. Const. amend. V. No oral argument was held. Fed R. Civ. P. 78(b). For the following reasons, both competing motions for summary judgment are **DENIED**. This case will proceed to trial.

I.    **BACKGROUND**

The following facts are described in further detail in the Court's Opinion granting class certification under Rule 23. ECF No. 179. Since 2006, GTL has been the exclusive provider of ICS to all prisons and jails operated by the State of New Jersey and to each county facility except Passaic. These include 20 New Jersey Department of Corrections ("DOC") facilities and 21 county facilities.[1] *See* Taylor Decl. in Supp. Cert. ("Taylor

---

[1] New Jersey facilities generate roughly five percent of GTL's revenue. *See* Taylor Decl., Ex. E,

1

Decl."), Ex. E. New Jersey law classifies GTL as an "alternative operator service" ("AOS"),[2] subject to regulation by the New Jersey Board of Public Utilities ("BPU" or "the Board"). GTL's interstate calling services are subject to regulation by the Federal Communications Commission ("FCC").[3] Historically, however, federal and state regulators have declined to interpose rate limits on New Jersey correctional facilities.[4]

Plaintiffs are inmates of New Jersey correctional facilities between 2006 and 2016 who used GTL's phone services, as well as non-inmates (generally, their friends and family) who used GTL's services to communicate with inmates during that time.[5] Plaintiffs allege that, in the absence of rate regulation, they were charged excessive rates and fees for ICS. They estimate they were overcharged more than $150 million over the class period. *See* Taylor Decl., Ex. M., Extended Rebuttal Report of Michael F. Finneran, at 2.

In 2005, GTL won an exclusive contract to provide ICS for the DOC and most county correctional facilities. Remaining counties, except for Passaic, formed independent contracts with GTL or one of its subsidiaries. As part of these contracts, GTL paid the facilities "site commissions," defined as "a straight percentage of all originating, billable revenue." Taylor Decl., Ex. J, Report of Melissa Copeland at 5. Because commissions produce substantial revenue for the State and counties, ICS contracts are often awarded to the provider who offers the highest commissions to facilities.[6] *See, e.g.*, Taylor Decl., Ex. Q, Rebuttal Report of Dr. Roy Epstein, ¶¶ 24-27; Van Nostrand Decl., Ex. 11, Essex County Decision Memorandum (June 6, 2006) ("[T]his is a revenue generating arrangement."). Stephen Yow, GTL's CFO, agreed that site commissions were likely the most important feature of ICS service agreements. Yow Dep. Tr. 42:4-5. GTL offered a range of commission options within each contract; the DOC chose to receive a 40% commission for calls from state facilities. Most counties

---

Report of Michael Finneran at 2.

[2] The authorizing statute defines an "alternate operator service provider" as a "non-facilities based telecommunications carrier who is a reseller leasing lines from local exchange carriers and interexchange carriers and who, using these leased facilities along with their own operators, provides operator-assisted services." N.J.S.A. § 48:17-23.

[3] Approximately 90% of calls handled by GTL are intrastate. Taylor Decl., Ex. G (Yow Dep., 94:20-95:6)

[4] *See, e.g.*, *Global Tel*Link v. FCC*, 866 F.3d 397, 401 (D.C. Cir. 2017) ("[P]rior to the *Order* under review in this case, the Commission had never sought to impose rate caps on intrastate calls."); Maxwell Slackman, *Calling from Prison: Economic Determinants of Inmate Payphone Rates*, 10 J.L. Econ. & Pol'y 515, 524 (2014).

[5] For a more a precise definition of the Class, see the Court's Opinion on class certification. ECF No. 179.

[6] For instance, Atlantic County's 2007 RFP stated that "the responsive and responsible bidder offering the Highest Commission Rate to the County," which could be "not less than 50 percent." Copeland Report at 7.

selected options that paid the highest commissions, either 55% and 56%. *See, e.g.*, Epstein Report ¶ 25.

To earn a profit, GTL paired higher commission rates with higher per-minute rates, surcharges, and "ancillary fees" incurred by GTL's end users. *See, e.g.*, Yow Dep. 170:16-20. Ancillary fees included, for instance, a 19% fee each time a non-inmate set up or deposited funds into a GTL Advance Pay account by telephone.[7] Taylor Decl., Ex. H, Baker Dep. Tr. 37:8-38:11. As Mr. Yow explained, "imposing deposit fees is a way to generate enough revenue from the facility to administer the commission they're expecting and also to cover all the other costs that we have to provide the service in that jail." Yow Dep. 170:16-20; *see, e.g.*, Dr. Epstein Rebuttal Report ("[D]eposit fee revenue can be used to recoup site commissions paid to facilities.").

Plaintiffs argue that this "revenue sharing" configuration resulted in calling rates and fees that were far in excess of the actual cost of providing ICS. They claim, for example, that GTL was charging as much as $1.00 per minute for calling time that GTL purchased from telecom providers for as little as $.00018 per minute. Pls.' Br. Supp. Cert. at 1; Van Nostrand Decl., Ex. I, Decl. Michael Barth ¶ 8. Because GTL's contracts with the DOC and counties were exclusive, Plaintiffs—unlike normal telephone users—could not choose among different providers, and generally paid amounts far in excess of industry standards. *See, e.g.*, *Global Tel*Link*, 866 F.3d at 401 ("ICS per-minute rates and ancillary fees together are extraordinarily high."). In effect, GTL operated a state-sanctioned monopoly that generated substantial revenue for the government and GTL by imposing artificially high rates and fees on inmates and their loved ones. *See id.* ("Winning ICS providers thus operate locational monopolies with a captive consumer base of inmates and the need to pay high site commissions.")(citation omitted).

In 2013, when this case was filed, there were roughly 23,000 inmates in New Jersey correctional facilities.[8] Ms. King's challenges are typical of many individuals who could not afford to stay connected with their incarcerated loved ones. As the FCC has formally acknowledged, the social and economic impacts of ICS are grave:

> Excessive ICS rates also impose an unreasonable burden on some of the most economically disadvantaged in our society. Families of incarcerated individuals often pay significantly more to receive a single 15-minute call from prison than for their basic monthly phone service. We have received

---

[7] An Advance Pay account is simply a prepaid account set up by a non-inmate (usually a family member) providing funds for the inmate to call a particular number or set of numbers. Alternative payment methods, such as sending a check by mail, Western Union, or (at certain facilities) paying at on-site kiosks, were available, but only 10-15 percent of class members used these methods. Baker Dep. Tr. 37:8-38:11.

[8] www.state.nj.us/corrections/pdf/offender_statistics/2013/Total%20NJDOC%20Inmates%202013.pdf.

3

tens of thousands of comments from individuals, including many personal stories from inmates, their family members and their friends about the high price of staying in touch using ICS. These rates discourage communication between inmates and their families and larger support networks, which negatively impact the millions of children with an incarcerated parent, contribute to the high rate of recidivism in our nation's correctional facilities, and increase the costs of our justice system. Familial contact is made all the more difficult because "mothers are incarcerated an average of 160 miles from their last home, so in-person visits are difficult for family members on the outside to manage."

FCC Report & Order & Notice of Further Rulemaking, FCC 13-113 (Sept. 26, 2013).

Since the FCC issued the above Report and Plaintiffs filed this lawsuit, New Jersey's legislature has taken measures to eliminate the practices at issue and to reduce the future costs of ICS to end users. In August 2016, the legislature enacted a statute prohibiting site commissions in all state, county, and private correctional facilities in New Jersey; limiting rates to 11 cents per minute for domestic debit, prepaid, and collect calls, and outlawing "any service charge or additional fee exceeding the per minute rate, including, but not limited to, any per call surcharge, account set up fee, bill statement fee, monthly account maintenance charge, or refund fee." N.J.S.A. § 30:4-8.12. GTL now charges roughly 5 cents per minute for all calls. Taylor Decl., Ex. K.

**The Instant Motions for Summary Judgment**

The parties should be familiar with the procedural history of this case. A detailed account is nonetheless provided in the Court's Opinion granting class certification. ECF No. 179. The remaining claims include:

- Count One: Violation of CFA, N.J.S.A. § 56:8-2, for "unconscionable business practices";
- Count Two: Violation of CFA Disclosure Requirements, N.J.S.A. § 56:8-176(h);
- Count Four: Unjust Enrichment; and
- Count Six: Violation of the Takings Clause, brought under 42 U.S.C. § 1983.

GTL moves for summary judgment on all claims. Plaintiffs oppose and cross-move for summary judgment on their Takings claim. This Opinion disposes of both motions.

4

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007). "When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 270 (3d Cir. 2006).

## III. Defendants' Motion for Summary Judgment

GTL seeks judgment as to all remaining claims against it. It argues (A) that the CFA claims do not apply to GTL because they interfere with ICS regulation by other state and federal agencies; (B) plaintiffs alleging "unconscionable business practices" under the CFA must show deceptive conduct, which Plaintiffs cannot; (C) the CFA's disclosure requirements do not apply to GTL; (D) the Takings claims under § 1983 fail because GTL is not a "state actor" and because the claims are not ripe; and (E) the claims for unjust enrichment fail because there is no evidence of unjust conduct, and because the voluntary payment doctrine bars these claims. The Court now addresses each defense.

### A. Conflicts between the CFA and State and Federal Statutes

Two related arguments form the bulwark of GTL's motion for summary judgment: (1) applying the CFA to GTL would encroach upon the Board's exclusive authority to regulate alternate operator service ("AOS") providers pursuant to the AOSP Act, and (2) permitting private actions against GTL under the CFA would create "actual" and "potential" conflicts with existing state and federal ICS regulatory schemes. Both arguments fail.

#### i. The AOSP Act does not Prohibit CFA Claims

The "strong and sweeping legislative remedial purpose apparent in the CFA" creates a presumption that the CFA applies even to conduct regulated by other agencies. *Lemelledo v. Beneficial Corp. of Am.*, 696 A.2d 546, 553 (N.J. 1997). "The CFA explicitly states that the rights, remedies and prohibitions that it creates are cumulative to those created by other sources of law." *Id.* (citing N.J.S.A. § 56:8-2.12). The New Jersey Supreme Court has explained that the CFA's cumulative reach and its creation of a private cause of action "reflect an apparent legislative intent . . . to delegate [] authority

among various governmental and nongovernmental entities, each exercising different forms of remedial power." *Id.*

Nevertheless, GTL claims that the AOSP Act explicitly precludes CFA application by the following language:

> Notwithstanding the provisions of [the Telecommunications Act] or any other law to the contrary, the Board of Public Utilities shall regulate the rates and terms and conditions of service of an alternate operator service provider, in a manner consistent with federal law, and use any other means necessary pursuant to law, rule, or regulation to protect the users of the services of an alternate operator service provider.

N.J.S.A § 48:2-21.23.

GTL's argument falls short for two reasons. First, genuine issues of material fact remain as to whether GTL violated the Takings Clause by imposing excessive fees and rates. *See infra* at 14. If the jury finds that compliance with BPU's regulations was nevertheless unconstitutional, then the Board was not acting "in a manner consistent with federal law" when it passed these regulations, and was therefore not acting within its statutory limits. *See Lourdes Med. Ctr. of Burlington Cnty v. Board of Review*, 963 A.2d 289, 312 (N.J. 2009) (citations omitted) ("If a regulation is plainly at odds with the statute, the court must set it aside . . . the meaning of enabling legislation is pivotal to any analysis of the legitimacy of a rule."). That would leave a regulatory vacuum, appropriately filled by the "cumulative" enforcement authority of the CFA. *See Lemelledo*, 696 A.2d at 551.

Second, the Court is skeptical that the legislature intended the AOSP Act to preempt CFA actions against ICS providers. When New Jersey's Legislature wishes to create exclusive jurisdiction, it usually does so expressly. *See, e.g.*, *Doug Gant , Inc. v. Create Bay Casino Corp.*, 232 F.3d 173 (3d Cir. 2000). In *Doug Gant*, the Third Circuit dismissed CFA claims brought against certain casinos, because the authorizing statute imbued the Casino Control Commission with "exclusive jurisdiction over all matters delegated to it or within the scope of its powers under the provisions of this act." 232 F.3d at 188 (citing N.J.S.A. § 5:12-133b.). No such language appears in the AOSP Act. In fact, the legislature amended the CFA in 2009 to impose disclosure requirements on "prepaid calling service providers and prepaid calling card distributors." N.J.S.A. § 56:8-176. Even if GTL were not a "prepaid calling service provider," other AOSP providers probably are. This indicates that, in amending the CFA, the legislature intended to create "complementary, overlapping, and comprehensive" regulations. *Lemelledo*, 696 A.2d at 551.

ii. Purported Conflict with State ICS Regulation

A functioning administrative state cannot subject an entity to conflicting regulations. *See id.* at 552. Thus, a "direct and unavoidable" conflict with another regulatory scheme renders the CFA inapplicable. *Id.* at 554. To overcome the presumption of CFA's applicability, however, the Court "must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes." *Id.*

GTL argues that the Board has set rate limits for intrastate AOS providers, and that GTL cannot be punished so long as it has complied with those limits. N.J.A.C. § 14:10-6.2. For instance, in 1998, for calls up to five minutes, the Board set a maximum rate of $2.75 for intrastate calls and $4.25 for intrastate calls that require live operator assistance. *Id.*; *see In re Regulation of Operator Serv. Providers*, 778 A.2d 546, 562 (N.J. Super. App. Div. 2001). As Plaintiffs argue, however, these rates have not been updated in 20 years. Pls.' Br. at 11. Telephone calling rates have dropped precipitously over that span. Yow Dep Tr. 130:21-131:2. *See* 778 A.2d at 580 (acknowledging that the "constantly changing character of the telecommunications industry" necessitated expedited Board review of rate caps); FCC 13-113 ¶ 29 ("[T]he costs of providing ICS are decreasing, in part due to technological advances"). Indeed, evidence in the record suggests that costs to GTL had already decreased significantly by the beginning of the class period in 2006. Finneran Dep. 143:13-144:11. Meanwhile, Plaintiffs allege that GTL has routinely violated BPU's limits with impunity, avoiding the large monetary penalties that should have been deployed under BPU's penalties provision. *See* N.J.A.C. § 14:10-6.3.

Given its failure to update rate limits or enforce its own rules, the Board has failed to "regulate" GTL in a manner that would preclude private causes of action under the CFA's broad remedial framework. No "direct and unavoidable conflict exists between application of the CFA and application of [the AOSP Act]," because the AOSP Act is not being *applied* in the ICS context. *See Lemelledo*, 696 A.2d at 554. Accordingly, the CFA's "cumulative remedies" are simply doing regulatory work left undone by the Board. Prohibiting these private actions would expose Plaintiffs to the dangers of single-agency regulation foreseen in *Lemelledo*:

> When remedial power is concentrated in one agency, underenforcement may result because of lack of resources, concentration on other agency responsibilities, lack of expertise, agency capture by regulated parties, or a particular ideological bent by agency decisionmakers . . . Underenforcement by an administrative agency may be even more likely where . . . the regulated party is a relatively powerful business entity while the class protected by the regulation tends to consist of low-income persons with scant resources, lack of knowledge about their rights, inexperience in

7

the regulated area, and insufficient understanding of the prohibited practice. The primary risk of underenforcement—the victimization of a protected class—can be greatly reduced by allocating enforcement responsibilities among various agencies and among members of the consuming public in the forms of judicial and administrative proceedings and private causes of action.

*Lemelledo*, 696 A.2d at 553 (citing *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 87–88 (1990) (Stevens, J., concurring)). *See* Slackman, *supra* note 5, at 524 ("Cost regulation is necessary in the inmate payphone industry because payphone services have no close, legal substitutes, inmate demand is inherently inelastic, and the inmates' position as third-party beneficiaries incentivizes higher monetary commissions instead of lower end-user prices."). Defendants respond that these concerns "do not apply here, as there is no evidence of 'under enforcement' [*sic*]." But evidence exists in the form of ossified ratemaking. GTL cites to N.J.A.C. § 14:10-6.1(h) for the proposition that the Board "has done exactly what the Legislature instructed, including exercising authority to 'investigate' and 'evaluate compliance' . . . and imposing regulatory violations." Defs.' Br. 15. Yet there is scant evidence in the record of the Board actually doing any of these things, at least in the ICS context.

Ultimately, BPU's inactivity led to legislative intervention. In 2014, the AOSP Act was amended to require—as opposed to permit—the Board to regulate calling rates. In 2016, the Governor signed into law a statute banning site commissions; limiting domestic rates to 11 cents per minute; and prohibiting per-call surcharges, account set up fees, bill statement fees, monthly "account maintenance" charges, and refund fees. N.J.S.A. 30:4-8.12. Clearly, the legislature is not content leaving regulation of ICS to the BPU.

### iii. Purported Conflict with Federal ICS Regulation

Finally, GTL argues that the CFA claims potentially interfere with the FCC's authority to regulate interstate calls, which account for about 10% of GTL's calls. *See Global Tel*Link*, 866 F.3d at 412 (finding that the FCC lacked authority to set *intrastate* rate caps). The FCC has authority to set rate caps on interstate calls to ensure that charges are "just and reasonable." *Id.* at 401 (quoting 47 U.S.C. § 201(b)). The FCC made no attempt to set rate caps until its 2013 interim Order, which GTL and other ICS providers petitioned to the D.C. Circuit. *Id.* at 405 (citing 28 FCC Rcd. 14107, 14114-15 (2013)). The caps set by the FCC's final Order in 2015 were struck down by the D.C. Circuit. *Id.* 412. Thus, to date, the FCC has not established valid rate caps for ICS of any kind, and for most of its history has been inclined to leave ICS regulation to the states. It is possible that the FCC will someday preempt state regulation of interstate ICS by imposing rate caps that survive judicial review. Even so, rates deemed "just and reasonable" under the Telecommunications Act, § 201(b), are unlikely to be "unconscionable" under the CFA.[9]

---

[9] As a matter of last resort, GTL maintains detailed call records that would allow a claims

For these reasons, the prospect of federal preemption is overstated and offers no basis for summary judgment.

### B. "Unconscionable Commercial Practices" under the CFA do not Require Deception (Count One)

Federal courts sitting in diversity apply substantive state law, as interpreted by the state's highest court. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). The relevant CFA provision states as follows:

> The act, use or employment by any person of *any unconscionable commercial practice*, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J.S.A. § 56:8-2 (emphasis added).

GTL argues that "an unlawful practice" always involves deceptive conduct, which turns on each plaintiff's individual circumstances. Indeed, this CFA provision is ambiguous, and the New Jersey Supreme Court has not directly ruled on whether an "unlawful practice" requires deceptive conduct. Accordingly, this Court must determine how the state's highest court "would" rule if it were faced with this issue. *Comm'r of Internal Revenue v. Bosch*, 387 U.S. 456, 465 (1967). For the reasons below, the Court finds that liability for unconscionable business practices under N.J.S.A. § 56:8-2 does not always require that a plaintiff show deception. In light of the Court's interpretation of § 56:8-2, genuine issues of material fact exist as to whether GTL's rates and fees were, in totality, unconscionable.

i. <u>Unconscionability Does Not Necessarily Require Deception</u>

New Jersey courts "ascribe to [] statutory words their ordinary meaning and significance . . . and read them in context with related provisions so as to give sense to the legislation as a whole." *DiProspero v. Penn*, 874 A.2d 1039, 1048 (N.J. 2005). The Merriam-Webster Dictionary defines "unconscionable" as "(1) not guided or controlled by conscience . . . (2)(a) *excessive*, *exorbitant* . . . (b) lying outside the limits of what is reasonable or acceptable." Webster's Third New International Dictionary (3d ed. 1993) (emphasis added). Black's Law Dictionary defines "unconscionable" as:

---

administrator to weed out the roughly 10% of GTL calls that crossed state lines.

1. (Of a person) having no conscience; unscrupulous <an unconscionable used-car salesman>. 2. (Of an act or transaction) showing no regard for conscience; affronting the sense of justice, decency, or reasonableness <the contract is void as unconscionable>. Cf. CONSCIONABLE. 3. Much more than is acceptable or reasonable <an unconscionable delay>. 4. Shockingly unjust or unfair <an unconscionable offer>.

Black's Law Dictionary (10th ed. 2014). None of these iterations of "unconscionable" implies deception. Further, the CFA provision is crafted in the disjunctive: it proscribes "unconscionable commercial practices . . . . *or* knowing concealment . . . of any material fact . . . ." To be sure, the other words listed in § 56:8-2 deal with some type of deceptive conduct. *See Soto v. Scaringelli*, 917 A.2d 734, 742 (2007) (applying the interpretive canon *noscitur a sociis*: "that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it."). Nevertheless, to hold that "unlawful conduct" requires deception would arguably "render the phrase [unconscionability] superfluous." *Wilson v. Brick Twp. Zoning Bd. of Adjustment*, 963 A.2d 1208, 1216 (N.J. App. Div. 2009).[10] At least several intermediate New Jersey court decisions support the Court's reading of the CFA, including *D'Ercole Sales, Inc. v. Fruehauf Corp.*, 501 A.2d 990, 996 (N.J. App. Div. 1985):

> The statutory elements of N.J.S.A. 56:8-2 are in the disjunctive rather than the conjunctive. As such, a violation may occur if there is a showing of "unconscionable commercial practice." *Hyland v. Aquarian Age 2000, Inc.*, 148 N.J. Super. 186, 191, 372 A.2d 370 (Ch.Div.1977). There need be no showing of a deceptive or fraudulent act.

501 A.2d at 996. *See State v. Hudson Furniture Co.,* 398 A.2d 900, 902 (N.J. App. Div. 1979) ("[A] violation is complete if an unconscionable practice is proved; a deceptive or fraudulent act need not also be shown.").

In response, GTL points to *Quigley v. Esquire Deposition Services LLC*, which found that a cause of action under the CFA could not be made "solely by an allegation that the price of a product was excessive, without consideration of the manner in which it was marketed." 975 A.2d 1042, 1048 (N.J. Super. Ct. App. Div. 2009). The court reasoned that "in a capitalist society . . . prices are ordinarily established by the marketplace rather than by a government agency . . . ." *Id. Quigley* could not be further off point. The instant case is not "solely" about excessive rates, but also about "the manner in which" those rates were established—through site commissions and ancillary fees. From the end user's perspective, there was no marketplace. GTL enjoyed a

---

[10] Punctuation can be an important indication of legislative intent. Here, the absence of a colon or semicolon after "unconscionable business practices" indicates that the words following that phrase are not examples of it, but rather alternative forms of "unlawful conduct."

monopoly over individuals *held captive* "by a government agency." *Id.* If anything, *Quigley* implies when to permit CFA claims absent proof of deceptive conduct. *See* FCC 13-113 ¶¶ 40-41 (finding that "competition for ICS contracts may actually tend to increase the rate levels in ICS contract bids where site commission size is a factor in evaluating bids," while the "interest in just and reasonable rates is not necessarily represented in bidding or negotiation.").

These intermediate appellate decisions align with the New Jersey Supreme Court's keystone interpretation of the CFA in *Kugler v. Romain*, 279 A.2d 640 (N.J. 1971). The court explained that "unconscionability is an amorphous concept obviously designed to establish a broad business ethic," such that courts must "pour content into it on a case-by-case basis." *Id.* The legislature sought protection for "large segments of disadvantaged and poorly educated people" from "grievous exploitation by vendors using such devices as high pressure salesmanship, bait advertising, misrepresentation of prices, *exorbitant prices and credit charges,* and sale of shoddy merchandise." *Id.* at 648-49 (emphasis added). The court held that extracting a fee "excessive in relation to [a] defendant's cost" falls within the ordinary meaning of "unconscionable." *Id.* at 651. The court further explained:

> The intent of the clause is not to erase the doctrine of freedom of contract, but to make realistic the assumption of the law that the agreement has resulted from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion . . .
>
> The standard of conduct contemplated by the unconscionability clause is good faith, honesty in fact and observance of fair dealing. The need for application of the standard is most acute when the professional seller is seeking the trade of those most subject to exploitation—the uneducated, the inexperienced and the people of low incomes. In such a context, a material departure from the standard puts a badge of fraud on the transaction and here the concept of fraud and unconscionability are interchangeable.
>
> We have no doubt that an exorbitant price ostensibly agreed to by a purchaser of the type involved in this case—*but in reality unilaterally fixed by the seller and not open to negotiation*—constitutes an unconscionable bargain.

*Kugler*, 279 A.2d at 652 (emphasis added). *See also D'Ercole Sales, Inc.*, 501 A.2d at 998.

Inmates and their family members are often exceptionally vulnerable people. Plaintiffs allege they were compelled to pay excessive rates that, while subject to competition in other settings, were "unilaterally fixed by the seller and not open to

negotiation." *Kugler*, 279 A.2d at 652. Plaintiffs had absolutely no role in negotiating telephone charges and fees, which were instead a function of revenue-sharing agreements between GTL and the correctional facilities. *See, e.g.*, Van Nostrand Decl., Ex. H Essex County Decision Memorandum ("[T]his is a revenue generating arrangement."). Many Plaintiffs, like Betty King, who at various times had five family members incarcerated in New Jersey, accepted exorbitant rates out of desperation:

> [DEFENSE COUNSEL]: Do you believe that GTL tried to trick you in any way when you were using their services?
>
> THE WITNESS: I believe they cheated us out of our money, because you just . . . If you haven't been there, you don't know . . . I needed to be able to speak with my children, my sons, my brother, and my husband. I wasn't worried about the rates. I wasn't concerned about that. It's like I'll cross that bridge when I got there. I knew it was too much, but that was my only way. That was the only way.

King Dep. Tr. 111:17-112:9; *see* M. Skladany Dep. Tr. 28:23-25 ("[P]eople were always . . . talking about the phone rates, how outrageous and, you know, felt like we were being extorted.").[11]

Finally, the Court is mindful that its interpretation of the CFA deviates from *Ciser v. Nestle Waters N. Am. Inc.*, 596 F. App'x 157 (3d Cir. 2015), in which the Third Circuit declared that, "[u]ntil the New Jersey Supreme Court decides otherwise, we read precedent as suggesting that the CFA requires some element of deceptive conduct . . . to be actionable as an unconscionable practice." *Ciser*, 596 F. App'x at 162. *Ciser*, however, is expressly "non-binding precedent."[12] Its facts are entirely unrelatable to the facts now before the Court,[13] and the court made no reference to either of the above state decisions that found unconscionability without deception. *See supra* at 10. Again, the Court is obligated to construe the statute as it believes the *state's* highest court would.

   ii.   Unconscionability Presents a Genuine Question of Material Fact

The Court will not determine whether the rates and fees were so excessive as to be "unconscionable." That is a question of fact that should be decided by a jury. *See, e.g.*, *Leon v. Rite Aid Corp.*, 774 A.2d 674, 678 (N.J. Super. Ct., App. Div. 2001). Because

---

[11] As the state legislature found, "where a captive market exists for competitive telecommunications services, market conditions are not always able to protect the public interest." N.J.S.A. § 48:2-21.22.
[12] 596 F. App'x at 164 ("This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.").
[13] The plaintiff in *Ciser* was a business owner who misconstrued an arcane contractual provision regarding late-fee penalties in an arms-length purchase of water bottles. 596 F. App'x at 157-58.

GTL incorrectly assumed that the CFA requires deception, its papers failed to adequately address Plaintiffs' argument that rates and fees are grossly excessive in relation to GTL's costs. *See* Defs.' Reply Br., n. 5, 13. The inquiry should consider both the commission rates and ancillary fees—the total financial burden imposed on Plaintiffs in relation to the costs of providing those services. The record is rife with contradictory statements about the costs of providing ICS as well as the security and monitoring costs specific to individual state and county facilities serviced by GTL in New Jersey.[14] GTL's motion for summary judgment as to Count One under N.J.S.A. § 56:8-2 is **DENIED**.

### C. CFA Disclosure Requirements, N.J.S.A. § 56:8-176 (Count Two)

Count Two alleges that GTL failed to comply with certain disclosure requirements applicable to "prepaid calling service providers and prepaid calling card distributors" pursuant to a 2009 amendment of the CFA. N.J.S.A. § 56:8-176. GTL moves for summary judgment on the ground that it is not a "prepaid calling service provider" and thus not subject to regulation under N.J.S.A. § 56:8-176. The term "prepaid calling service" means "any prepaid telecommunications service that allows customers to originate calls through a local, long distance or toll-free access number and authorization code, whether manually or electronically dialed." § 56:8-175. GTL argues that it permitted inmates to call non-inmates directly without using an "access number" or "authorization code." Defs.' Br. 24. This does not seem consistent with the record. Although the law does not define "access number" or "authorization code," inmates were generally required to type a sequence of numbers into the telephone before dialing out. *See, e.g.*, M. Skladany Dep. 75:15-22, 106:7-9; Taylor Decl., Ex. 10, Inmate Handbook at 34.

While the individual Plaintiffs concede that GTL provided access to certain information as to rates, charges, and deposit fees, material questions of fact remain as to whether GTL disclosed all necessary information regarding surcharges under N.J.S.A. § 56:8-176 (h). *See* Pls. Opp. Summ. J. at 22. The motion for summary judgment as to Count Two is **DENIED**. Of course, Defendants may be found liable only for those violations taking place after the provision's 2009 enactment. Liability will depend on the individual circumstances of each Plaintiff; this is not a classwide claim.

### D. Takings Claim under Section 1983 (Count Six)

Plaintiffs' § 1983 claim alleges that GTL violated the Takings Clause of the Fifth Amendment by extracting "excessive and unconscionable charges . . . without just compensation." Compl. ¶ 134. GTL argues for summary judgment on two distinct grounds. First, GTL alleges that it cannot be liable under § 1983 because it is not a "state

---

[14] Dr. Epstein suggests that the rates were "reasonable" because they resulted from competitive bidding, Epstein Dep. ¶ 30, but the bidding process was anti-competitive from the viewpoint of end users. *See* Pls.' Opp. Br. n. 14, at 20.

actor." Second, it argues that the claims are not ripe because Plaintiffs have not exhausted all administrative remedies. Both arguments fail.

Liability under § 1983 extends only to "persons" acting "under color of state law." *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir.2005) (citation omitted). Nevertheless, a non-government entity may be a "state actor" under § 1983 under certain circumstances, as when a private actor and government work or operate together to achieve common interests. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982). The relevant inquiries are whether GTL was a "willful participant in a joint activity with the State or its agents," *id.* at 941, and whether the State provided "significant encouragement, either overt or covert," for the activity. *Kach v. Hose*, 589 F.3d 626, 648 (3d Cir. 2009).

The record clearly shows that GTL was a "willful participant" with the government in setting rates and fees for New Jersey correctional facilities. GTL made a calculated business decision to provide ICS to New Jersey facilities. The State and counties provided "significant encouragement" by awarding contracts based largely on which provider could generate the most revenue through site commissions. GTL responded by offering commission rates in excess of 40% of calling revenue, which the DOC and counties accepted. This was not a normal government contractor relationship. The facilities could not provide ICS without GTL, and GTL could not charge the rates it did without enjoying a state-sponsored monopoly over its end users. This is a case in which "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Kach*, 589 F.3d at 646 (citations omitted).

There is no dispute that higher commissions led to higher calling rates and fees, which form the basis for Plaintiffs' Takings claim. *See Kach*, 589 F.3d at 649 ("[T]he focus of our inquiry is not on whether the state exercises control over a putative state actor as a general matter, but whether the state has exercised control over the particular conduct that gave rise to the plaintiff's alleged constitutional deprivation.").[15] And while providing telephone services is not itself a "traditional public function," operating correctional facilities is.

Defendants further argue that the claims are not ripe because Plaintiffs have not exhausted all administrative remedies. Yet there does not appear to be any state administrative remedy available. *See Knick v. Twp. of Scott*, 862 F.3d 310, 323 (3d Cir. 2017), *cert. granted in part sub nom. Knick v. Twp. of Scott, Pa.*, 138 S. Ct. 1262 (2018). Plaintiff Mark Skladany attempted unsuccessfully to file written grievances at multiple facilities regarding what he perceived to be excessive phone rates. M. Skladany Dep. 30:19-33:6. And although the BPU has authority to fix rates, it does not appear

---

[15] Of course, contracting with a government agency does not automatically make the contractor a state actor, and most contractors are not state actors.

authorized to provide the sort of compensatory relief sought by Plaintiffs. *See* N.J.S.A. § 48:2. To the extent a petition for a rulemaking qualifies as administrative relief, the BPU already rejected a Petition that closely tracked the claims in this case. Van Nostrand Decl., Exs. 2, 3. Without an administrative process by which putative class members may apply for "just compensation," to require Plaintiffs to exhaust administrative remedies would be futile.

GTL's motion for summary judgment is **DENIED** as to Count Six, the Plaintiffs' Takings claim. The Court finds as a matter of law that GTL was a "state actor" here, and thus a "person" amenable to suit under § 1983.

### E. Unjust enrichment (Count Four)[16]

Unjust enrichment requires showing that a "defendant receive a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994). GTL argues that summary judgment is appropriate because (1) there is no evidence of any unjust conduct, since Plaintiffs "received exactly what they bargained for," and (2) the voluntary payment doctrine bars the claim. Defs.' Br. at 25.

First, because there are genuine questions of material fact as to GTL's costs, it is impossible for the Court to decide whether GTL's conduct was "unjust." That question will be answered by a jury. Further, the record demonstrates that no bargaining took place between Plaintiffs and GTL, so it cannot be said that Plaintiffs "received exactly what they bargained for." *Id.* at 25. All bargaining occurred between GTL and government.

Second, the "voluntary payment doctrine" is an exception to unjust enrichment that applies "where a party, without mistake of fact, or fraud, duress or extortion, voluntarily pays money on a demand which is not enforcible [*sic*] against him, [so] he cannot recover it back." *Simonson v. Hertz Corp.*, No. CIV.A. 1:10-CV-1585, 2011 WL 1205584, at *3 (D.N.J. Mar. 28, 2011) (citing *Matter of New Jersey State Bd. Of Dentistry*, 423 A.2d 640, 643 (N.J. 1980)). The Court finds that questions remain as to whether Plaintiffs were under duress at the time of payment. Pls.' Br. n. 22, at 28. Accordingly, GTL's motion for summary judgment as to unjust enrichment is **DENIED**.

## IV. Plaintiff's Motion for Partial Summary Judgment

Plaintiffs' opposition to summary judgment includes a cross-motion for partial summary judgment as to the issue of liability for the § 1983 Takings claims. They ask the Court to hold that GTL's rates and fees were "far more than a fair approximation of the costs." Pls.' Br. at 26. GTL responds that granting summary judgment against it would violate the "one-way intervention rule." It further argues that genuine questions of

---

[16] This claim is brought only by the individually-named Plaintiffs, not the entire class.

material fact remain as to whether GTL's rates and fees were "far more than a fair approximation of the costs." Defs.' Reply Br. at 20-21.

The "one-way intervention rule" prevents "members of the claimed class . . . [from] await[ing] developments in the trial or [] final judgment on the merits in order to determine whether participation would be favorable to their interests." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 547 (1974). According to GTL, "[r]uling on Plaintiffs' cross-motion would be prejudicial to GTL because, if the motion is denied, then putative class members would not be bound; but if the cross-motion is granted, putative class members could determine whether they wanted to join the class after GTL's liability on the taking claim had already had been determined." Defs.' Reply Br. at 19.

In this particular case, the Court finds no impropriety in deciding Plaintiffs' motion for summary judgment in favor of GTL. As the Court has already indicated, issues of material fact remain regarding the costs of providing ICS throughout the class period. Further, GTL's expert witness, Dr. Epstein, disputes Plaintiffs' assumption that charging 5 cents per minute would have been "a reasonable approximation of the cost of providing ICS service plus a reasonable profit." Pls.' Br. at 26. Under these circumstances, a jury trial is necessary. Plaintiffs' cross-motion for partial summary judgment is **DENIED**.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment and Plaintiffs' cross-motion for partial summary judgment are **DENIED**.

                                                  /s/ William J. Martini
                                                **WILLIAM J. MARTINI, U.S.D.J.**

**August 6, 2018**